**IN RE: Jesus MARTINEZ and Marco Ciro Flores, Debtors.**

**Case No.: 09–17008–MKN Jointly Administered with Case No.: 09–17010–MKN**

United States Bankruptcy Court, D. Nevada.

Signed 08/19/2016

Date: July 18, 2016, Time: 11:00 a.m.

Bryan A. Lindsey, Schwartz Flansburg PLLC, Sean E. McClenahan, Sean E. McClenahan, LTD, Nikoll Nikci, Samuel A. Schwartz, Las Vegas, NV, for Debtors.

## MEMORANDUM DECISION ON MOTION FOR SANCTIONS FOR VIOLATION OF THE DISCHARGE ORDER [1]

Honorable Mike K. Nakagawa, United States Bankruptcy Judge

On June 21, 2016, an evidentiary hearing was conducted on the Motion for Sanctions for Violation of the Discharge Order ("Sanctions Motion") brought by Jesus Martinez and Marco Ciro Flores ("Debtors"). The appearances of counsel were noted on the record. After the evidence was presented, post-trial briefing was ordered, and the hearing was continued for closing arguments.

On July 18, 2016, closing arguments were presented, and the matter was taken under submission.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law entered pursuant to FRBP 7052 and FRCP 52.

## BACKGROUND [2]

On May 1, 2009, Jesus Martinez filed a voluntary Chapter 11 petition. On the same date, Marco Ciro Flores filed a voluntary Chapter 11 petition. On their respective real property Schedule "A," each Debtor listed the same eight separate parcels of real property, including an investment property located at 4520 36th Street in San Diego, California ("36th Street Property").

On May 5, 2009, four days after filing their Chapter 11 petitions, Debtors filed a motion to jointly administer the two Chapter 11 cases. (MECF No. 11; FECF No. 12).[3] On the same date, Debtors filed a motion to value their investment properties ("Valuation Motion"), including the 36th Street Property. (MECF No. 17; FECF No. 18). The motion identified Central Mortgage Corporation ("CMC") as having a lien on the 36th Street Property securing a loan having a balance of $286,957.58. The motion proposed to value the 36th Street Property at $120,000 for purposes of allowing CMC a secured claim in that amount pursuant to Section 506(a). The certificate of service attached to the Valuation Motion states that it was served on all of the affected creditors, including CMC.

On May 6, 2009, an order was entered authorizing joint administration of the two

1. In this Memorandum Decision, all references to "ECF No." are to the numbers assigned to the documents filed in the jointly administered cases or the minute entries of the court as they appear on the docket maintained by the clerk of the court. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All references to "NRS" are to provisions of the Nevada Revised Statutes. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure. All references to "FRCP" are to the Federal Rules of Civil Procedure.

All references to "FRE" are to the Federal Rules of Evidence.

2. The parties stipulated to the admission of 123 exhibits, as described below. In this Memorandum Decision, the exhibits will be referenced as "Ex." followed by the applicable number or letter designation.

3. "MECF No." refers to the documents and minute entries in the Martinez proceeding while "FECF No." refers to the documents and minute entries in the Flores proceeding.

Chapter 11 proceedings, with the Martinez bankruptcy serving as the lead case. (MECF No. 18; FECF No. 19). On the same date, notice of the hearing on the Valuation Motion was served on all of the affected creditors, including CMC. (ECF No. 21).[4] No opposition, objection, or response to the Valuation Motion was filed or presented by CMC.

On June 12, 2009, an order was entered valuing the 36th Street Property at $120,000 ("Valuation Order"), thereby treating CMC's claim as allowed in the secured amount of $120,000, and allowed in the unsecured amount of $166,957.58. (ECF No. 41).

On September 3, 2009, CMC filed a proof of claim ("POC"). (Ex. 1). The claim was in the secured amount of $299,788.72. Attached to the POC is a copy of an Adjustable Rate Note ("Adjustable Note") dated February 3, 2005, executed by the Debtors in favor of Downey Savings and Loan Association, F.A., along with a copy of the Deed of Trust against the 36th Street Property. Also attached to the POC as Exhibit "1" is a statement attesting that the monthly payments on the Adjustable Note from November 2008 through March 2009 were $1,054.87 and the monthly payments from April 2009 through May 2009 were $1,133.99.

On October 26, 2009, Debtors jointly filed a Disclosure Statement ("First Disclosure Statement") (ECF No. 82) to accompany their jointly proposed Plan of Reorganization. (ECF No. 81). CMC was served with the Debtors' joint proposed Plan of Reorganization that provided for CMC to retain its lien against the 36th Street Property, for its secured claim to be allowed in the revalued amount of $120,000, and for the allowed amount to be paid in full in accordance with the terms of the original note and mortgage. The unsecured portion of CMC's claim would receive pro rata payments from the amounts paid to unsecured creditors from the Debtors' projected monthly income under the plan. Article VI of the proposed Plan of Reorganization provided that after confirmation, all property would vest in the reorganized debtors. Additionally, like all individual Chapter 11 cases, Article VII of the proposed Plan of Reorganization provided that the Debtors would not receive a discharge of their personal liability on their creditors' claims until completion of all payments under the proposed plan in accordance with Section 1141(d)(5). Article IV of the First Disclosure Statement addressed the means for implementation of the Debtors' proposed plan. It stated in pertinent part that "The Debtors' Cash Flow Analysis is attached hereto as Exhibit D and outlines the Debtors' sources and uses of income." The Cash Flow Analysis attached as Exhibit D to the First Disclosure Statement sets forth each of the Debtors' investment properties, including the original and revalued mortgage payments for each property. As to the 36th Street Property, Exhibit D discloses the existing monthly payment as $1,107.61, and a proposed revalued payment of $465.20.

On December 28, 2009, Debtors filed a Second Amended Plan of Reorganization (ECF No. 101) accompanied by a Second Amended Joint Disclosure Statement. (ECF No. 102). The Second Amended Plan of Reorganization did not change the proposed treatment of any secured creditor claims, including the allowed secured claim of CMC. Attached as Exhibit D to the Second Amended Joint Disclosure Statement is the same Cash Flow Analysis dis-

---

4. After joint administration was ordered, all subsequent documents and minute entries are for the docket in the lead case (Martinez) and will be referred to solely as "ECF No."

closing a revalued monthly payment of $465.20 for the 36th Street Property.

On December 29, 2009, CMC filed a motion for relief from stay as to the 36th Street Property ("CMC Stay Relief Motion"). (ECF No. 107). (Ex. 2).

On January 19, 2010, an objection to approval of the Second Amended Joint Disclosure Statement as well as to confirmation of the Second Amended Plan of Reorganization was filed by the Office of the United States Trustee ("UST"). (ECF No. 114). On the same date, CMC objected to confirmation of the Second Amended Plan of Reorganization as well as approval of the Second Amended Joint Disclosure Statement. (ECF No. 115). While CMC's objection cited Section 1322(b)(2), rather than Section 1123(b)(5), it argued only that CMC's claim was misclassified as unimpaired rather than impaired because it was being bifurcated into secured and unsecured portions.

On January 26, 2010, Debtors filed an opposition to the CMC Stay Relief Motion. (ECF No. 127).

On February 3, 2010, Debtors filed a Third Amended Joint Plan of Reorganization (ECF No. 134) along with a Third Amended Joint Disclosure Statement (ECF No. 136).[5] The Third Amended Joint Plan of Reorganization did not change the proposed treatment of any secured creditor claims, including CMC's allowed secured claim.[6] The Third Amended Joint Disclosure Statement referred to the same Cash Flow Analysis attached as Exhibit D to the prior disclosure statements.[7]

On February 17, 2010, notice of the hearing to approve the Third Amended Joint Disclosure Statement was filed, that included a certificate stating that the notice was served electronically and by first class mail on CMC and its counsel. (ECF No. 146). No objection to approval of the Third Amended Joint Disclosure Statement was filed or presented by CMC.

On March 17, 2010, the court approved the Third Amended Joint Disclosure Statement and a written order was entered on April 8, 2010. (ECF No. 171). The order scheduled a hearing on confirmation of the Third Amended Joint Plan of Reorganization to take place on May 12, 2010. (ECF No. 171). The order approving the Third Amended Joint Disclosure Statement was not appealed.

On April 8, 2010, notice of the hearing on confirmation of the Third Amended Joint Plan of Reorganization was served on all creditors, including CMC. (ECF No. 174).

On May 11, 2010, objections to confirmation of the Third Amended Joint Plan of Reorganization were filed by secured creditors BankUnited (ECF No. 181) and

---

5. A combined hearing on approval of the Second Amended Joint Disclosure Statement and confirmation of the Second Amended Plan of Reorganization was held on January 25, 2010. Due primarily to the objections raised by the UST, the Debtors agreed that approval and confirmation should be denied, and that an amended plan and disclosure statement would be filed. The written order denying approval and confirmation eventually was entered on March 15, 2010. (ECF No. 158).

6. Article II, Section 2.02 of the Third Amended Joint Plan of Reorganization sets for the treatment of CMC's allowed secured claim in Class 2(f). Subparagraph (b) reiterates that the allowed amount of CMC's secured claim shall be paid "in accordance with the terms of its related note and mortgage."

7. Prior to the confirmation hearing on the Third Amended Joint Plan of Reorganization, Debtors filed another copy of the exhibits to the Third Amended Joint Disclosure Statement, including the Cash Flow Analysis found in Exhibit D, notice of which was electronically served on CMC's counsel of record. (ECF No. 188).

EMC Mortgage Corporation (ECF No. 182), both based on separate Chapter 11 claim treatment elections filed under Section 1111(b) ("1111(b) Election"). No creditors holding allowed unsecured claims objected to plan confirmation under Section 1129(a)(15), and no objection to plan confirmation was filed by CMC.

On May 12, 2010, the hearing on plan confirmation was continued to May 26, 2010. (ECF No. 191).

On May 26, 2010, the continued hearing on confirmation of the Third Amended Joint Plan of Reorganization was conducted at which both Debtors were available for examination. Although issues surrounding the 1111(b) Election were resolved at plan confirmation, a late-filed objection by America's Servicing Company ("ASC") was presented. As a result, after the confirmation hearing was concluded, the matter was taken under submission.

On June 14, 2011, an order was entered confirming the Third Amended Joint Plan of Reorganization ("Confirmation Order"). (ECF No. 249). (Ex. 3). The Confirmation Order specifically referenced the Cash Flow Analysis set forth in Exhibit D to the approved Third Amended Joint Disclosure Statement. Id. at 4:8–15.[8] In addition to resolving the late objection of ASC, the order specified the monthly payments required to be made to BankUnited and EMC Mortgage Corporation to satisfy their 1111(b) Election. No other amendments to the Third Amended Joint Plan of Reorganization were required in the Confirmation Order. Notice of the order was mailed to all creditors, including CMC. (ECF No. 255). The order confirming the

Third Amended Joint Plan of Reorganization was not appealed.

On August 4, 2011, Debtors filed a proposed Fourth Amended Joint Plan of Reorganization (ECF No. 258) along with a motion to modify the confirmed Third Amended Joint Plan of Reorganization. (ECF No. 259). Notice of the hearing to approve the modification was served on all creditors, including CMC. (ECF No. 260). The purpose of the proposed modification, as set forth in the proposed Fourth Amended Joint Plan of Reorganization was to eliminate any requirement for the Debtors to pay their projected disposable income to unsecured creditors because no holder of an allowed unsecured claim had objected to plan confirmation under Section 1129(a)(15). As a result, the payment of unsecured creditor claims under the Debtors' plan, including the unsecured portion of the claims of secured claimants such as CMC, would no longer be required. No modification of the plan treatment of any secured creditor class, including CMC's allowed secured claim, was proposed.

On August 24, 2011, objections to modification of the confirmed plan were filed by secured creditors Aurora Loan Services (ECF No. 262) and ACT Properties (ECF No. 263). No opposition, objection, or response to the proposed modification was filed by CMC.

On October 25, 2011, an order was entered approving the modification and confirming the Fourth Amended Joint Plan of Reorganization ("Plan Modification Order"). (ECF No. 277). (Ex. 4). Notice of the order was mailed to all creditors, in-

---

8. Debtors filed a brief in support of confirmation of their Third Amended Joint Plan of Reorganization. (ECF No. 179). Electronic notice of the filing of the brief was served on CMC's counsel. In support of the feasibility of their proposed Chapter 11 plan, Section 11 of the Debtors' confirmation brief specifically referenced the Cash Flow Analysis as set forth in their Third Amended Joint Disclosure Statement.

cluding CMC. (ECF No. 278). The Plan Modification Order was not appealed.

On March 5, 2012, Debtors filed a motion for entry of a final decree and an order of discharge. (ECF No. 289). Debtors asserted that payments were not required to be made on unsecured claims as a result of the modified plan. Debtors also represented that Section 522(q) is not applicable. Debtors argued that entry of a discharge was appropriate under Sections 1141(d)(5)(A) and 1141(d)(5)(C). Notice of the hearing on the motion was served on all creditors, including CMC. (ECF No. 290). On March 28, 2012, an objection was filed by the UST. (ECF No. 292). No opposition, objection, or response to the request was filed by any creditor, including CMC. On June 14, 2012, an order was entered granting the Debtors' motion. (ECF No. 298). (Ex. 5).

On June 18, 2012, an order granting the Debtors' Chapter 11 discharge was entered ("Discharge Order"). (ECF No. 299). (Ex. 6). On June 20, 2012, notice of the Discharge Order was mailed to all creditors, including CMC. (ECF No. 300). The Discharge Order was not appealed.

On July 17, 2012, notice of entry of the Chapter 11 discharge was filed and served on all creditors, including CMC. (ECF No. 304). (Ex. 7).

On April 22, 2013, a final decree closing the Chapter 11 case was entered. (ECF No. 305). (Ex. 8).

On August 7, 2014, Debtors filed an ex parte motion to reopen their Chapter 11 case. (ECF No. 308). On August 8, 2014, an order was entered reopening the case (ECF No. 310) (Ex. 9), and notice of entry of the order was served on all creditors, including CMC. (ECF No. 314). (Ex. 11).

On August 8, 2014, Debtors filed a Motion to Clarify and Enforce Confirmation Order and Request for an Accounting ("Clarification Motion") (ECF No. 311), to address certain alleged post-confirmation breaches by three secured creditors, including CMC. (Ex. 10). Notice of the motion was served on all three secured creditors, including CMC. (ECF No. 316). As to CMC, the Debtors alleged that CMC did not adjust its servicing of the loan to comply with the Confirmation Order, see Clarification Motion at ¶ 14, but instead proceeded to file a notice of default on the 36th Street Property and scheduled a foreclosure sale. Id. at ¶¶ 8 and 9. CMC did not file an opposition, objection, or a response.

On September 23, 2014, an order was entered requiring CMC to provide a complete accounting of the loan through September 15, 2014. (ECF No. 323). (Ex. 12). Notice of entry of the order was served on CMC. (ECF No. 324). (Ex. 13). Because CMC did not comply, Debtors filed a motion seeking an order to show cause ("OSC") why CMC should not be held in contempt. (ECF No. 329). (Ex. 14). On October 31, 2014, the OSC was entered (ECF No. 332), but a hearing was not scheduled. (Ex. 15).

On February 4, 2015, Debtors filed a Motion for Attorneys Fees and Costs ("Fee Motion") (ECF No. 349) alleging that after the OSC was entered, CMC provided a payment history that showed a dispute of $600.00 between the parties as to the unpaid principal balance of the loan. See Fee Motion at ¶¶ 4, 5, and 6. Notice of the Fee Motion was served on CMC (ECF No. 344) and no opposition, objection, or response was filed. On April 2, 2015, an order was entered granting the Fee Motion in the amount of $3,500 for attorneys fees and $1,717.00 for the costs for reopening the Chapter 11 proceeding. (ECF No. 350). (Ex. 16). Notice of entry of the order was served on CMC. (ECF No. 351). (Ex. 17). The order was not appealed.

On January 27, 2016, Debtors filed the instant Sanctions Motion seeking relief against CMC (ECF No. 370) (Ex. 18), accompanied by the joint declaration of Marco Flores and Jesus Martinez ("Joint Declaration"). (ECF No. 371). (Ex. 19). Debtors asserted that CMC violated the Discharge Order as well as the discharge injunction arising under Section 524(a)(2) ("Discharge Injunction"). As a result, Debtors requested an award of actual damages for emotional distress, punitive damages for contempt, and attorneys fees incurred in enforcing the Discharge Order and Discharge Injunction. The Sanctions Motion was noticed to be heard on March 2, 2016. (ECF No. 372). On February 17, 2016, CMC filed opposition ("CMC Opposition"). (ECF No. 375). (Ex. 20). CMC alleged that none of its conduct violated the Discharge Injunction and that its conduct substantially complied with the terms of the Confirmation Order and confirmed Chapter 11 plan. See CMC Opposition at 10:8–13. On February 24, 2016, Debtors filed a reply. (ECF No. 376). (Ex. 21).

On March 2, 2016, counsel for the parties appeared at the scheduled hearing, at which the court determined that numerous factual disputes could be resolved only through an evidentiary hearing. Accordingly, on March 3, 2016, an order was entered scheduling an evidentiary hearing to be conducted on May 24, 2016. (ECF No. 378). (Ex. 22).[9] By stipulation of the parties, the evidentiary hearing was continued to June 21, 2016. (ECF No. 383).

On June 17, 2016, Debtors filed their list of witnesses and exhibits (ECF No. 385), along with their trial statement ("Debtors' Trial Statement"). (ECF No. 386). On the same date, Debtors filed their pre-trial brief in connection with the Sanctions Motion ("Debtors' Pre–Trial Brief"). (ECF No. 389). On the same date, CMC filed the declarations of Nathan F. Smith ("Smith Declaration") (ECF No. 388) and James M. McPherson ("McPherson Declaration"). (ECF No. 387).[10]

On June 20, 2016, Debtors filed an amended trial statement ("Debtors' Amended Trial Statement"). (ECF No. 390). On the same date, CMC filed a response to Debtors' pretrial brief and the Debtors' trial statements. ("CMC Pre–Trial Brief"). (ECF No. 391).

On June 21, 2016, the evidentiary hearing was conducted. At the outset, the court granted CMC's request, without prejudice, to strike certain of the Debtors' claims asserted in their pre-trial briefs and trial statements. Those claims sought additional or alternative relief under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., and under certain Nevada consumer protection statutes. Those claims were stricken without prejudice.

After the evidentiary hearing was concluded, a post-trial briefing schedule was agreed upon.

On July 15, 2016, Debtors filed their post-trial brief ("Debtors' Closing Brief"). (ECF No. 398). On the same date, CMC

---

9. As a contested matter under FRBP 9014(a), the discovery rules applicable to adversary proceedings also applied to the Sanctions Motion. See FED. R. BANKR. P. 9014(c). The court is unaware of whether either party sought discovery of the contentions or evidence in support of their respective positions, or to depose each other's witnesses prior to the evidentiary hearing.

10. The McPherson Declaration appears to be a fill-in-the-blank document that does not even include the declarant's name in its title. Instead, the declarant's name is inserted into the identification line, his name is inserted into the capacity paragraph and signature block, and his name does not actually appear under an illegible signature.

filed its post-trial brief ("CMC Closing Brief"). (ECF No. 399). Shortly thereafter, counsel orally presented their closing arguments.

## THE EVIDENTIARY RECORD

The parties stipulated to the admission of 123 exhibits. Three witnesses were called to testify: debtors Jesus Martinez and Marco Flores, and CMC officer James McPherson.[11] The direct testimony of each witness, included in their previous declarations, was admitted. All of the witnesses were subject to additional direct testimony as well as cross-examination.

### A. The Exhibits.

The following exhibits were admitted into evidence by stipulation.

#### 1. Debtors' Exhibits.

| No. | Date | Document |
|---|---|---|
| 1 | 9/3/2009 | CMC's Proof of Claim No. 9 |
| 2 | 12/29/2009 | CMC's Stay Relief Motion |
| 3 | 6/14/2011 | Order on Plan Confirmation |
| 4 | 10/25/2011 | Order Granting Mtn. to Modify Debtors' Plan |
| 5 | 6/14/2012 | Order Granting Discharge and Final Decree Closing Debtors' Chapter 11 Cases |
| 6 | 6/18/2012 | Discharge of Individual Debtor in a Chapter 11 Case |
| 7 | 7/17/2012 | Ntc. of Entry of Order Granting Discharge and Final Decree Closing Debtors' Chapter 11 Cases |
| 8 | 4/22/2013 | Order Entering Final Decree |

---

11. At the trial, Christy Cahall, who apparently is a law clerk to the Debtors' counsel, was available to testify concerning communications between the Debtors' counsel and CMC's attorneys as well as the foreclosure trustee used by CMC in connection with the 36th Street Property. Ms. Cahall was not called to testify.

| 9 | 8/8/2014 | Order Reopening Chapter 11 Case |
|---|---|---|
| 10 | 8/8/2014 | Mtn. Clarify and Enforce Confirmation Order |
| 11 | 8/8/2014 | Ntc. of Entry of Order Reopening Chapter 11 Case |
| 12 | 9/23/2014 | Order Compelling CMC to Provide Accounting |
| 13 | 9/23/2014 | Ntc. of Entry Order Compelling CMC to Provide Accounting |
| 14 | 10/28/2014 | Ex Parte Mtn. for OSC Why CMC Should Not Be Held in Contempt for Failure to Comply with Order to Provide Accounting |
| 15 | 10/31/2014 | Order Granting Mtn. for OSC Re: CMC Not Complying with Order to Provide Accounting |
| 16 | 4/2/2015 | Order Granting Fee Motion |
| 17 | 4/2/2015 | Ntc. of Entry Order Granting Fee Motion |
| 18 | 1/27/2016 | Motion for Violation of Discharge Order |
| 19 | 1/27/2016 | Decl. Flores and Martinez re Motion for Violation of Discharge Order |
| 20 | 2/17/2016 | CMC's Opp. re Motion |
| 21 | 2/24/2016 | Reply to Opp. re Motion |
| 22 | 3/3/2016 | Order Scheduling Evidentiary Hearing |
| 23 | 4/14/2014 | Notice of Default and Election to Sell re San Diego Property |
| 24 | 4/23/2014 | Cahall email to Guiab re Notice of Default and Election to Sell |
| 25 | 4/23/2014 | Cahall email to Northwest Trustee re Notice of Default and Election to Sell |
| 26 | 4/23/2014 | Rasanen (Northwest Trustee) email re case status |
| 27 | 4/23/2014 | Cahall email to Rasanen re Discharge Order |
| 28 | 4/23/2014 | Rasanen email re forwarding all documents to bankruptcy department |
| 29 | 4/29/2014 | Guiab email indicating he forwarded email to CMC |
| 30 | 6/10/2014 | Cahall email to Rasanen following up on Notice of Default and Election to Sell |
| 31 | 6/10/2014 | Cahall email to Guiab following up on Notice of Default and Election to Sell and CMC foreclosure |
| 32 | 7/7/2014 | Cahall email to Guiab following up on Notice of Default and Election to Sell and CMC foreclosure |

| 33 | 7/8/2014 | Guiab email to Cahall in response to Notice of Default and Election to Sell |
|----|----------|------|
| 34 | 7/8/2014 | Guiab email to Cahall regarding plan terms |
| 35 | 7/8/2014 | Cahall email to Guiab regarding plan terms |
| 36 | 7/8/2014 | Guiab email regarding maturity date |
| 37 | 7/8/2014 | Cahall email to Guiab regarding maturity date |
| 38 | 7/11/2014 | Guiab email to Cahall re incorrect plan payments |
| 39 | 7/11/2014 | Cahall email to Guiab requesting loan payment history |
| 40 | | Notice of Trustee Sale on August 11, 2014 |
| 41 | 7/24/2014 | Cahall email to Guiab attaching Notice of Trustee Sale |
| 42 | 7/25/2014 | Guiab email to Cahall confirming received message re Trustee Sale |
| 43 | 7/28/2014 | Schwartz ltr. to tenants at 36th Street Property |
| 44 | 7/29/2014 | Guiab email to Cahall re postponing Trustee Sale and obtaining accounting of the loan |
| 45 | 7/29/2014 | Barry email to Cahall re letter to tenant |
| 46 | 7/30/2014 | Cahall email to Guiab re status postpone Trustee Sale |
| 47 | 7/30/2014 | Cahall email to Barry re revising letter to tenant to correct typographical error |
| 48 | 8/6/2014 | Cahall email to Guiab re reopening case, file mtn clarify, enforce confirmation order, and postpone sale |
| 49 | 8/8/2014 | Cahall email to Guiab attaching filed copy of Order Reopening Chapter 11 Case |
| 50 | 8/8/2014 | Cahall email to Rasanen attaching filed copy of Order Reopening Chapter 11 Case and Ntc. of Trustee Sale w/request to stop foreclosure sale |
| 51 | 8/12/2014 | Schwartz email to Barry re case reopening |
| 52 | 8/12/2014 | Allen email to Katz attaching filed copy of Order Reopening Chapter 11 Case and Ntc of Trustee Sale . . . |
| 53 | 8/13/2014 | Katz email to confirm sale was rescinded |
| 54 | 9/23/2014 | Cahall email to Guiab Ntc. of Entry Order Compelling CMC to Provide Accounting |
| 55 | | Payment history from CMC 6/26/2009-11/6/2014 |
| 56 | 12/9/2014 | Schwartz email to Smith indicating CMC's accounting is incorrect |
| 57 | 12/22/2014 | Schwartz email to Smith request loan term and % rate |

| 58 | 12/29/2014 | Exnowski email to Cahall confirm CMC's term/% rate |
|---|---|---|
| 59 | | Schwartz Flansburg's loan amortization |
| 60 | 8/11/2014 | CMC ltr to Martinez/Flores re returned funds, etc . . . |
| 61 | 7/8/2014 | CMC ltr to Martinez/Flores re returned funds, etc . . . |
| 62 | 5/12/2014 | CMC ltr to Martinez/Flores re returned funds, etc . . . |
| 63 | 2/10/2014 | CMC ltr to Martinez/Flores re returned funds, etc . . . |
| 64 | 2/4/2014 | CMC ltr to Flores mailed to 36th Street Property re past due status & cure default . . . |
| 65 | 2/4/2014 | CMC ltr to Flores mailed to Summerhill Rd., LV address re past due status & cure default . . . |
| 66 | 2/4/2014 | CMC ltr to Martinez mailed to 36th Street Property re past due status & cure default . . . |
| 67 | 2/4/2014 | CMC ltr to Martinez mailed to Summerhill, LV address re past due status & cure default . . . |
| 68 | 1/9/2014 | Ltr to Martinez/Flores re credit balance, etc . . . |
| 69 | 11/7/2013 | Ltr to Martinez/Flores re credit balance, etc . . . |
| 70 | 8/8/2013 | Ltr to Martinez/Flores re credit balance, etc . . . |
| 71 | 7/18/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 72 | 6/19/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 73 | 5/18/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 74 | 4/17/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 75 | 11/17/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 76 | 10/20/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 77 | 9/17/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 78 | 8/18/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 79 | 7/20/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 80 | 6/17/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |

| 81 | 5/19/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 82 | 4/14/2009 | Foreclosure notice from CMC to Martinez/Flores |
| 83 | 3/20/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 84 | 2/16/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 85 | 1/18/2012 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 86 | 12/20/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 87 | 11/17/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 88 | 10/18/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 89 | 9/19/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 90 | 8/18/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 91 | 7/19/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 92 | 6/17/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 93 | 5/18/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 94 | 4/19/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 95 | 3/18/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 96 | 2/15/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 97 | 1/18/2011 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 98 | 12/20/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 99 | 11/17/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 100 | 10/19/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |

| 101 | 09/17/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 102 | 8/18/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 103 | 7/20/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 104 | 6/17/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 105 | 5/18/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 106 | 4/19/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 107 | 3/18/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 108 | 2/18/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 109 | 1/19/2010 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 110 | 12/21/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |
| 111 | 12/18/2009 | Rate Adj. Ltr. to Martinez/Flores re payment not going to be adjusted, etc . . . |

## 2. CMC's Exhibits.

| Ltr | Date | Document |
| --- | --- | --- |
| A | | CMC Post-petition Loan payment history |
| B | 4-14-2014 | CMC's notice of default and election to sell |
| C | 7-18-2014 | CMC's notice of trustee's sale |
| D | 7-25-2014 | Emails between counsel |
| E | 8-8-2014 | Emails between Debtors' counsel and foreclosure trustee |
| F | 1-14-2015 | Emails between counsel |
| G | 8-15-2015 | Emails between counsel |
| H | | Second revised stipulation sent between counsel |
| I | 9-23-2015 | Email regarding commencement of litigation |
| J | | Loan amortization table from Debtors' counsel |
| K | 8-8-2013 | CMC's return payment letters |
| L | 2-4-2014 | CMC's letters re notice of default |

## B. The Witnesses.

Three witnesses testified and were subject to cross-examination.

### 1. Jesus Martinez ("Martinez").[12]

Martinez testified that he grew up in Havana, Cuba, before immigrating to Miami, Florida, when he was twenty-four years old. He was educated in Cuba and lived in Florida for one year before moving to Reno, Nevada. Five years later, he moved to Las Vegas. In Reno, he worked in a kitchen at the MGM Hotel and then worked in the grocery business after moving to Las Vegas. He currently works for a Smith's grocery store.

Martinez testified that he started purchasing investment real estate in around 1992, in San Diego and Las Vegas. He recalled purchasing the 36th Street Property some time in 1996, initially residing in it. Martinez purchased that property with his partner, Marco Flores, and the purchase originally was financed by a lender other than CMC. He recalled that the property was refinanced through CMC two or three years later.

Martinez testified that the amount of the original loan on the 36th Street Property was around $264,000, and that the monthly payment was in excess of $1,000.00. He acknowledged that it was an adjustable interest rate loan, but he did not recall how often the monthly payment amounts changed.

Martinez testified that he makes the mortgage payments on the investment properties while Flores deals with the tenants and property managers. He testified that the arrangement was very successful until the economic recession hit in 2008 and 2009. Martinez stated that Flores attempted to work out the mortgage problems, but was unsuccessful. For that reason, both of them filed separate Chapter 11 cases in May 2009.

Martinez testified that after the bankruptcy cases were filed, the 36th Street Property was revalued at $120,000 and payments of around $465.00 per month were made to CMC based on that value. He stated that he paid that amount each month and never missed a payment.

Martinez testified that during the Chapter 11 proceeding, he received letters from CMC dated October 20, 2009 (Ex. 76) and November 17, 2009 (Ex. 75),[13] stating that he owed payments of $1,133.99 each month rather than $465.00. He recalled that the bankruptcy process was very stressful, causing him to lose concentration at work, because he thought he would lose the property. Martinez testified that he also received telephone calls from CMC after the Chapter 11 was filed. He answered calls from CMC three times per week and

---

**12.** Martinez testified with the occasional assistance of an interpreter.

**13.** The November 16, 2009 letter, like the October 20, 2009 letter, says "Notice of Rate Adjustment" near the top. Unlike all of the other letters ("Rate Adjustment Letters") admitted into evidence, however, the November 2009 letter contains an additional paragraph near the bottom stating as follows: "Your monthly payment is not large enough to cover the interest that is due each month. The interest not covered by your payment, which is called deferred interest, will be added to the principal balance. Presently your loan has a deferred interest balance of $24,122.55. If you continue to make the payment of $1,133.99, your principal balance will go from $286,461.95 to $287,283.30 as of the next rate change on January 1, 2010." None of the subsequent Rate Adjustment Letters explained that the Debtors' monthly payments of $465.20 (or even $1,133.99) would be insufficient to cover interest or that there would be a growing deferred interest balance. Martinez testified that he received such letters every month during the bankruptcy.

spoke to a different person each time.[14] Martinez stated that the caller always asked for more than the amount he was paying. When the calls came to work, he testified that when messages were left, the message only said that the caller "had to talk to me."

Martinez recalls that his Chapter 11 plan was approved by the court on June 14, 2011. He testified that after the plan was confirmed, he continued to make the $465.00 monthly payments. Martinez acknowledged on cross-examination that Class 2(f) of the confirmed plan does not mention a $465.00 monthly payment on CMC's claim, but testified that he "didn't just make it up." He acknowledged that he never received any document from CMC saying to make monthly payments of $465.00, nor did he receive anything changing the adjustable interest rate on his loan to a fixed rate. Martinez conceded that if the loan was not modified, the monthly payments would be much higher, probably around $1,000.00.

Martinez testified that after his Chapter 11 plan was confirmed, he received letters from CMC dated April 17, 2012 (Ex. 74) and May 18, 2012 (Ex. 73), stating that monthly payments of $1,341.58 were owed instead. CMC, however, had been accepting the $465.00 payments.

Martinez testified that he received a Chapter 11 discharge on June 18, 2012, and that his case was closed. He testified that he remembers receiving a call from CMC some time around October 5, 2012, which is Flores's birthday. He stated that during that call, someone from CMC demanded payment of the amount set forth in the prior letters. Martinez testified that after that initial call, he received calls from CMC approximately three times every week, at home and at work, asking for payment of the amount contained in the prior letters. He testified that those calls continued until CMC eventually foreclosed on the 36th Street Property.

Martinez reviewed a letter from CMC dated August 8, 2013 (Ex. K), indicating that a payment of $547.40 had been received and that an additional $82.20 was due. He testified that he does not know why CMC claimed that $82.20 was due. Martinez testified that he called CMC to obtain an accounting, but CMC never called him back. Martinez was shown letters from CMC dated November 7, 2013, January 9, 2014, and February 10, 2014 (Ex. K), all stating the monthly payment amount to be $547.40.

Martinez testified that CMC stopped accepting payments some time around July 2014, and he received a letter from CMC dated July 8, 2014 (Ex. 61), returning a $465.00 payment even though those payments had been accepted since 2009. He received a letter from CMC dated May 12, 2014 (Ex. 62), returning a check and no accounting of payments was given. Martinez recalled receiving a letter dated February 10, 2014 (Ex. 63), returning an electronic payment, and the letter stated that $547.40 was due rather than $465.00. He stated that CMC's letter did not explain how CMC came up with the higher amount. Martinez testified that he contact-

---

14.  It is not clear whether CMC sought discovery to obtain copies of any phone records—either cellular, land line, or internet-based—for Martinez or Flores. Perhaps consumer telephone records are simply unavailable or cost-prohibitive. Barring an employee's use of a personal cell phone to conduct business, an employer should be able to obtain a record of outbound calls by its employees as well as inbound calls to the employer. Given the proliferation of both bankruptcy and non-bankruptcy claims alleging wrongful telephonic and electronic communications received by debtors and plaintiffs, one would expect that such records, if any, would be sought in the first instance.

ed CMC periodically, but CMC never responded even though CMC kept calling to collect. Based on the various letters, he believed that CMC was attempting to collect the full amount of the debt.

Martinez testified that CMC filed a Notice of Default and Election to Sell ("NOD") on the 36th Street Property (Ex. 23; Ex. B)[15] even after he contacted his lawyers. He testified that the notice was sent to the tenants of the property, which led to many problems for Flores. Martinez testified that he does not understand how the $2,278.43 arrearage amount in the NOD was calculated. He therefore understood that CMC was attempting to collect the full amount of the original $264,000 loan.

Martinez testified that the NOD led to many arguments with Flores, because it was his responsibility to make the payments. He testified that the stress caused him to lose sleep, interfered with taking care of customers at work, and led to fights with Flores.

Martinez testified that CMC foreclosed on the 36th Street Property on August 11, 2014. He recognized the notice of trustee's sale ("Notice of Sale") and acknowledged that the notice stated that there was a total unpaid loan balance of $104,346.49 (Ex. 40; Ex. C). Martinez testified that he does not believe that he had paid more than $160,000 on the original $264,000 loan. He therefore acknowledged that the $104,346.49 unpaid loan balance set forth in the Notice of Sale must have been based on payments made toward the revalued amount under the confirmed Chapter 11 plan.

Martinez testified that even after the foreclosure, some other company continued to call to collect the debt for CMC. He testified that the caller sought between $70,000 and $80,000, and also told him that he was personally responsible for the debt. Martinez testified that he does not recall the name of the company that called him or the name of the person. He testified that he received three calls per week telling him that the original loan amount was still due. Martinez stated that his Chapter 11 case was reopened on August 8, 2014, and a few weeks later the calls stopped after the foreclosure was unwound and the 36th Street Property was returned. He attested that he continues to pay the $465.00 amount electronically and is current.

### 2. Marco Flores ("Flores").

Flores testified that he was born in Tijuana, Mexico, and immigrated to San Diego, California, when he was eight years old. He obtained his bachelor's degree in speech communication from San Diego State University and a master's degree from National University. Flores worked in the social services field from 1987 through 2007, primarily for a county public health department focusing on HIV/AIDS education. He testified that he has worked as a therapist and program director for HIV and AIDS treatment in Las Vegas.

Flores testified that to meet his retirement goals, he began investing in real estate in 1992 along with Martinez, whom he had met in Las Vegas. In his business partnership with Martinez, Flores would deal with tenants, property managers, and lenders, due to his fluency in English,

---

15. There is a difference between the copies of the NOD offered as exhibits by the Debtors and CMC. Debtors' copy (Ex. 23) does not include the first page of the NOD, but does include what appears to be the face of an envelope from the foreclosure trustee, North- west Trustee Services, Inc., addressed to "TENANTS" at the 36th Street Property. CMC's copy (Ex. B) does include a copy of the first page of the NOD, but no copy of the envelope showing that it was mailed to the tenants.

while Martinez would take care of making the monthly mortgage payments. He started investing in San Diego real estate after September 2001. Flores testified that the 36th Street Property was purchased some time during the 2000s.

Flores testified that he and Martinez lived in the 36th Street Property for two years before treating it as investment property. After the recession hit in around 2008, he contacted CMC about the mortgage, but he could not refinance the property because its value had dropped to a point where it was underwater. Flores testified that he used his retirement funds to make various mortgage payments, but real estate values had dropped by 30% in San Diego and by 60% in Las Vegas. On May 1, 2009, both he and Martinez filed separate Chapter 11 proceedings in Nevada because they were not viewed as a married couple even though they were domestic partners in California.[16]

After his bankruptcy was filed, Flores thought all mortgage payments would be made in accordance with a list received from his attorneys. He testified that he understood that the monthly payment on the 36th Street Property was $465.00 based on a value of $120,000. Flores testified that he had checked bank statements each month to confirm that the payments were made.

Flores testified that the Chapter 11 process was stressful because he had to go through the confirmation process twice. He testified that after his plan was confirmed in 2011 and he received his dis-

charge in 2012, he thought he was done with the process.

Flores testified that he started receiving calls from CMC around October 20, 2012, which was about two weeks after his birthday. He testified that sometimes there were three calls in a single day, but recalls that he would answer only one of three because they distracted him from his work.[17] Flores testified that he would refer the calls to his attorneys and that the callers would state that it was an attempt to collect a debt, that the call was being recorded, and that the amount requested was between $980 and $1,000, which he thought was the monthly payment amount under the original adjustable rate loan. He testified that he does not recall the names of the people who called from CMC. Flores testified that the calls were initially automated calls that would go live after he answered.

Flores testified that he thought automatic payments were being made to CMC. He does not know when CMC started rejecting the $465.00 monthly payments. Flores testified that CMC never sent him tax statements reflecting interest payments because CMC told him that payments were not being applied to interest. He does not recall ever receiving a loan history document, which was offered by CMC in the form of the Post-petition Loan History at trial, and he does not know if Martinez ever received it.

Flores testified that the NOD recorded by CMC had been received by the tenants

---

**16.** Because the Debtors' assets and liabilities were nearly or actually identical, the cases were jointly administered even though, at the petition date, they did not qualify as joint debtors. If the Debtors are now married, they would be eligible to simply file a joint bankruptcy petition under Section 302(a), and their bankruptcy estates would be consolidated under Section 302(b).

**17.** Flores was not asked whether he had screened all incoming calls through a message machine or was using a caller identification device on his phone in order to know that an unanswered call actually was from CMC or a representative of CMC.

at the 36th Street Property. He stated that the tenants panicked, as well as the property manager. Flores was not familiar with the NOD when a copy was shown to him at trial, but testified that the arrearage amount set forth in the notice was not paid. He testified that he had heard that other people started peering into the windows of the property after foreclosure proceedings were commenced. Flores testified that he was in disbelief that CMC was not following the legal process, and he started arguing with Martinez who had assured him the payments were being made. He testified that after CMC completed the foreclosure on August 11, 2014, additional notices were sent to the tenants, giving them 72 hours to vacate the premises. Flores stated that this caused additional stress.

Flores testified that after the foreclosure was completed, he received calls to his cell phone from another company asserting that it represented CMC. The caller told him that $72,000 was due and attempted to collect the debt from him personally. Flores testified that the calls stopped after the Chapter 11 proceeding was reopened by his attorneys, and CMC thereafter returned the 36th Street Property.

Flores testified that he sought professional help for the stress, anxiety, and feeling of helplessness caused by CMC's actions starting in May 2014. He still takes antidepressant medication, although he has not missed work. Flores acknowledges that his job as a therapist, listening to other people's problems, is also very stressful.

### 3. James McPherson ("McPherson").

McPherson is a litigation supervisor and a vice president at CMC. In December 2010, he graduated from the law school at the University of Arkansas in Little Rock, and he was admitted to practice in Arkansas the following year. McPherson has worked for CMC for more than ten years. According to his declaration, McPherson is familiar with the type of records maintained by CMC for the Debtors' loan. He testified that he has access to the books and records for the loan, and reviewed the records on which his testimony is based. He also testified that he has reviewed a comment history on the loan that involves calls that were made or attempted to be made to the borrowers.[18]

McPherson testified that a document entitled Post-petition Loan History had been prepared for the loan.[19] He testified that after Debtors' plan was confirmed, the his-

---

18. McPherson initially testified on direct examination that he had reviewed a "comment history" that includes calls made to the Debtors. Later in his testimony, counsel asked McPherson if CMC had ever produced a "call log" which does not appear to be the same as a comment history. The call log that McPherson reviewed apparently had not been disclosed in discovery. As became clear from his later testimony, however, McPherson did not review any auto-dialed calls and had no personal knowledge of the calls made in connection with the loan. Rather, his knowledge of CMC's call history in this case was based solely on what he could ascertain from the CMC records that he did not create. McPherson offered no explanation as to how CMC creates, updates, maintains, or secures its call logs, or how the comment histories of the loan records are created.

19. At the evidentiary hearing, CMC offered a loan history that was admitted as CMC's Exhibit "A." The exhibit is entitled a "Post-petition Loan History" even though it begins with payments due as of November 1, 2011, i.e., 2.5 years after the bankruptcy proceedings were commenced. Attached as Exhibit "A" to the CMC Opposition filed on February 17, 2016 (Ex. 20), was another document entitled "Payment History" for the same loan that begins with a payment posting date of June 26, 2009, and ends with a payment posted on November 6, 2014. At the hearing, McPherson curiously testified that Payment History "may have been" created by CMC even though CMC previously represented that

tory showed that on November 1, 2011, CMC applied $17,679.60 that had been received from the Debtors after the bankruptcy was filed.[20] McPherson testified that CMC reduced the balance of the loan to $120,000 in accordance with the confirmed plan. He testified that from November 1, 2011, CMC applied monthly payments of $547.40 to the reduced loan through August 1, 2012, rather than the $465.20 that the Debtors were paying.[21] McPherson testified that CMC fixed an interest rate to the loan based on the interest rate that would have existed on the confirmation date under the original adjustable rate loan, and then added that amount to the $465.20 payment. He acknowledged that none of CMC's records reflect that CMC ever notified the Debtors how their post-petition payments had been applied.

McPherson also acknowledged that CMC sent a letter dated April 17, 2012

---

it is the accounting that CMC provided to the Debtors. See CMC Opposition at ¶ 12. The Payment History, however, provides information that the Post-petition Loan History does not. Page two of the Payment History includes twelve entries posted on 8/17/2012. The first ten of those entries show that on that date, CMC applied monthly payments of $547.40, from the Debtors' accumulated post-petition payments on hand ($17,679.60), for the contractual payments due for the first day of November 2011 through August 2012. The last two of those entries for 8/17/2012, show that CMC applied the remaining portion of the Debtors' accumulated post-petition payments to escrow payments and to reduce the principal balance of CMC's allowed secured claim that was crammed down by the confirmed Chapter 11 plan. In other words, the Payment History indicates that on August 17, 2012, more than a year after the Third Amended Joint Plan of Reorganization was confirmed, and shortly after the Debtors received their Chapter 11 discharge, CMC changed the amount of the monthly payment approved by the confirmed plan and retroactively applied that changed amount to the payment that would have been due on November 1, 2011.

**20.** The $17,679.60 total is equal to 38 payments of $465.20. According to CMC's own Payment History, however, the 38th payment of $465.20 was posted on August 9, 2012. By contrast, CMC's own Post-petition Loan History does not show the date the August 2012, payment was received from the Debtors. Instead, the latter document shows a total amount received of $17,679.60 against which CMC subtracted $547.40 in principal and interest payments each month beginning with November 1, 2011, leaving $12,205.60 after it subtracted the August 1, 2012 payment. From

that amount, CMC appears to have subtracted an escrow payment of $2,854.57, leaving a balance of $9,351.03 from the Debtors' total post-petition payments. It apparently applied the $9,351.03 balance to the principal of the cramdown amount ($120,000) of CMC's secured claim. After the principal reduction left a balance of $108,127.91 on the cramdown loan amount, CMC continued to administer the loan as if monthly payments of $547.40 were due rather than the $465.20 amount specified in the Cash Flow Analysis. As a result, from September 1, 2012 forward, Debtors' monthly plan payments of $465.20 continued to generate, according to CMC Post-petition Loan History, payment shortfalls. McPherson testified that he "did not honestly know" how CMC made the decision in August 2012 to apply the $17,679.60 in post-petition payments to the cramdown loan amount that had been ordered in June 2011. He testified that CMC decided on its own to apply the payment in that fashion.

**21.** McPherson testified that he believed CMC had applied a 2.981 percent interest to a revalued loan balance of $120,000, thereby arriving at a monthly payment of $547.40, i.e., an additional $82.20 of interest above the $465.20 payment under the confirmed plan. It appears, however, that the $465.20 payment under the Cash Flow Analysis already may have included interest because it was a payment in lieu of a monthly payment of $1,107.61 under the original Adjustable Note for the full amount of the loan. According to its POC, the monthly payments under the Adjustable Note fluctuated from $1,054.87 to $1,133.99 between March 2009 and April 2009. Debtors' Cash Flow Analysis accompanying their approved disclosure statement originally was filed on October 28, 2009.

(Ex. 74), to the Debtors notifying them that no adjustable interest rate increase would be made and that their monthly payment would remain at $1,341.58. Additionally, the same letter stated that the Debtors' new loan balance would be $268,078.31. He acknowledged that the letter was inaccurate because it did not reflect the cramdown payment and balance required by the confirmed plan. McPherson also testified that similarly inaccurate letters were sent to the Debtors dated May 18, 2012 (Ex. 73), June 19, 2012 (Ex. 72), and July 18, 2012 (Ex. 71), stating that the monthly payments would be $1,341.58, but that the new loan balances would be $267,385.14, $266,689.01, and $265,991.20, respectively.[22] He also testified that based on CMC's Post-petition Loan History, a $465.00 payment was returned on February 1, 2014, but that no payments were received at all in April, May, June, July, October, and December 2014. He also testified that payments in 2015 and 2016, have been sporadic.

McPherson testified that the Post-petition Loan History did not reflect several payments that the Debtors had made, but which had been returned by CMC. He acknowledged that CMC sent letters dated February 4, 2014, May 12, 2014 (Ex. 62), July 8, 2014 (Ex. 61), and August 11, 2014

(Ex. 60), returning payments of $465.20 each time, but that those returned payments are not reflected on the Post-petition Loan History.

McPherson testified that CMC sent letters to the Debtors dated August 8, 2013, November 7, 2013, and January 9, 2014. (Ex. K). He testified that the monthly payment amount set forth in the letters reflected the proper amounts under the loan as crammed down by the confirmed plan. McPherson testified that, according to the August 8, 2013 letter, the $465.20 payment made by the Debtors on August 1, 2013, was insufficient, and that the Debtors were delinquent on the payments required by the confirmed plan as of that date.[23] Although he did not write the letters, he testified that the letters were not sent to collect the discharged portion of the original loan. McPherson acknowledged that letters dated February 4, 2014 (Ex. L; Exs. 64, 65, 66, 67) were sent to various addresses demanding payment of a $1,199.22 deficiency that was based on the cramdown loan amount.[24] He testified that the demand was not for the discharged amount and that the disclaimer on page two of the letter specifically indicated that no portion discharged in bankruptcy was being sought.[25]

22. In contrast to those letters, McPherson also testified that CMC sent additional rate adjustment notice letters dated May 19, 2009 (Ex. 81), June 17, 2009 (Ex. 80), July 20, 2009 (Ex. 79), August 18, 2009 (Ex. 78), September 17, 2009 (Ex. 77), October 20, 2009 (Ex. 76), and November 17, 2009 (Ex. 75), that correctly reflected what was in CMC's books and records for the Debtors' loan on those dates.

23. After accepting $465.20 monthly payments for over three years, it is unclear why CMC determined the payments to be insufficient and the Plan to be in default. CMC never objected to the Cash Flow Analysis accompanying the Third Amended Joint Disclosure Statement, nor did it object to confirmation of

the Third Amended Joint Plan of Reorganization. It also did not appeal the order approving the Third Amended Disclosure Statement nor the Confirmation Order.

24. McPherson also testified that CMC also sent a letter dated February 10, 2014 (Ex. K), stating that the total amount due under the loan was $199.22. He acknowledged that the information set forth on the face of the two letters, six days apart, was not clear, but that the later letter from CMC was referring to a shortfall in the latest bill payment, not the overall amount of the arrearage.

25. The language states: "For borrowers filing for bankruptcy protection and automatic stay

McPherson testified that the NOD was sent by the foreclosure trustee, Northwest Trustee Services.[26] He testified that the foreclosure trustee had been provided all of the information regarding the loan including the various bankruptcy information. McPherson acknowledged that the representative of its foreclosure trustee had expressed its belief on April 23, 2014, that the Debtors' bankruptcy had been terminated on April 22, 2013 (Ex. 26; Ex. E), but McPherson did not know where the foreclosure trustee obtained the erroneous information. McPherson stated that the $2,378.43 arrearage amount was the delinquency under the loan amount crammed down under the confirmed plan. McPherson also testified that the $104,346.49 amount set forth in the Notice of Sale reflected the amount due after payments were made on the cramdown amount determined by the confirmed plan.

McPherson testified that he reviewed the post-petition phone call records for the loan. He testified that the first record of an auto-dialed phone call was in August 2013,[27] and that there were many attempts to reach the Debtors at four different phone numbers, but that the Debtors were never reached. McPherson testified that there were no calls to a Southern Nevada area code and all calls were to a San Diego area code.[28] He testified that there were no records of auto-dialed calls reaching the Debtors, nor records of calls threatening to seek personal liability. McPherson testified that he did not review any of the auto-dialed calls, but that he has a general familiarity with the outbound language. He testified that an outbound call would only identify CMC as the caller and would only leave a number to call back, but would disclose no other information. McPherson testified that CMC has its own collection and homeowners' assistance departments, and CMC does not use third-party collection agencies.

McPherson testified that he has no idea who would have made collection calls after the foreclosure was completed. He stated

---

has been lifted by order or discharge, please be advised Central Mortgage Corporation is NOT attempting to collect a debt from you personally. However, notice is required under the terms of the Security Interest prior to proceeding with any foreclosure action against the property."

26. McPherson testified that CMC paid Northwest Trustee Services to conduct the foreclosure sale, but he does not know whether Northwest Trustee Services was CMC's agent. He acknowledged that CMC sent information to Northwest Trustee Services to conduct the foreclosure sale, and that such information typically would include a copy of the promissory note, mortgage, title policy, loan modification, cramdown, and other bankruptcy data. McPherson testified that he does not know whether Northwest Trustee Services independently obtained information that the Debtors' bankruptcy cases had been terminated before it completed the foreclosure sale.

27. As previously discussed, Martinez testified that after the Discharge Order was entered on June 14, 2012, he started receiving phones calls from CMC shortly after Flores's birthday. Flores testified that those calls from CMC started on or about October 20, 2012. McPherson testified that CMC's first record of an auto-dialed phone call appears in August 2013. Thus, there is about a 10 month period in which CMC suggests that no phone calls were ever made after the Debtors received their discharge.

28. This is troubling because the exhibit attached to the NOD consisted of a declaration from CMC's "foreclosure lead" signed on April 1, 2014, attesting to CMC's efforts to contact the borrower. Under the option regarding efforts to contact the borrower by telephone, CMC's employee declared under penalty of perjury that CMC had "no #s in which to contact borrower." It is difficult to reconcile McPherson's testimony that CMC made many attempts to reach the Debtors at four different phone numbers when CMC's foreclosure lead also attested that CMC had no numbers in which to contact the Debtors before requesting the NOD to be filed.

that there would be little reason to make such calls after a foreclosure on the 36th Street Property because the State of California is an anti-deficiency state. McPherson testified that, moreover, CMC is not authorized to seek deficiencies unless the investor holding the loan authorizes a deficiency to be pursued. He testified that the Debtors' loan is not held by Freddie Mac or Fannie Mae, but he did not recall the name of the trust that held the loan. McPherson further testified, however, that CMC's records did not show a direction by the investor to seek a deficiency. He also testified that even after a discharge, phone calls will be made to borrowers to remind them that they still need to keep current on their payments to keep the property.

McPherson acknowledged that the foreclosure sale was completed on August 12, 2014, but after the case was reopened, the foreclosure trustee informed CMC that the sale had to be rescinded.[29] He testified that the third party who purchased the 36th Street Property had received its funds back.[30]

## SCOPE OF MATTERS PRESENTED

As previously mentioned, at the beginning of the evidentiary hearing, the court struck without prejudice certain claims in the Debtors' pretrial brief that were never mentioned in their Sanctions Motion. In their statements before trial, as well as their supporting brief, Debtors requested a further award of damages for violation of the FDCPA in addition to NRS 598 and NRS 41.600, as well as damages for violation of the automatic stay under Section 362(k). See Debtors' Trial Statement at 2:12–19; Debtors' Pre–Trial Brief at ¶¶ 49–56, and ¶¶ 57–59; Debtors' Amended Trial Statement at 2:12 to 3:2. CMC properly objected to being sandbagged as to the FDCPA and state law claims, see CMC Pre–Trial Brief at 6:8 to 7:8, and the court agreed that those claims would not be considered in connection with the Sanctions Motion. As to any claims for violation of the Confirmation Order, the Discharge Order, the Discharge Injunction, and the automatic stay, the court permitted the Debtors to proceed.

29. McPherson testified in writing that Debtors' counsel "did not consult with CMC prior to unilaterally contacting the foreclosure trustee, which was done without CMC's knowledge or consent." McPherson Declaration at ¶ 11. It is not clear why CMC's knowledge or consent would have been required because CMC is not a law firm representing the foreclosure trustee. Additionally, McPherson testified that CMC's bankruptcy counsel did not handle the foreclosure process, and McPherson did not know whether the foreclosure trustee is CMC's agent. Moreover, the exhibits admitted at trial indicate that Debtors' counsel initially contacted CMC's bankruptcy counsel of record on April 23, 2014, to question the NOD, but CMC's bankruptcy counsel did not respond until April 29, 2014. (Ex. 29). In the interim, Debtors' counsel contacted Northwest Trustee Services directly by email on the same day and got a response the same day. (Exs. 24, 25, 26, 27, 28). Debtors' counsel followed up with Northwest Trustee Services on June 10, 2014 by email (Ex. 30), but the foreclosure trustee recorded the Notice of Sale on July 18, 2014 (Ex. 40; Ex. C). Although CMC's bankruptcy counsel forwarded counsel's inquiries to its client on April 29, 2014 (Ex. 29), apparently CMC had not responded to its bankruptcy counsel as of July 7, 2014 (Exs. 31, 32). Additional communications between counsel from July 8, 2014 to July 11, 2014 (Exs. 33, 34, 35, 36, 37, 38, 39), confirm CMC's determination that the Debtors had been making the incorrect monthly payment on the loan.

30. McPherson was not asked, nor did he testify, as to the identity of the purchaser at the foreclosure sale or as to the amount paid. Thus, it is not known whether the investor on the Adjustable Note attempted to acquire the 36th Street Property by credit bid or whether a third party offered more than the balance set forth in the Notice of Sale.

But the Debtors were not alone in overreaching in this matter. CMC has argued, both prior to the evidentiary hearing on the Sanctions Motion and after the hearing, that Debtors' claims for damages and attorneys' fees previously were settled. See CMC Pre–Trial Brief at 4:9–25; CMC Closing Brief at 12:20 to 13:2. It alleges that a settlement was reached between counsel and that a draft settlement stipulation was circulated. It asserts that the Debtors reneged and filed the Sanctions Motion. As proof of this double ·dealing, CMC submitted a copy of the draft settlement stipulation. (Ex. H).[31] CMC emphasized that, in fact, it had paid $5,217.00 in attorneys' fees and costs to the Debtors as further proof that a binding settlement had been reached and consummated.

CMC conceded at closing argument, however, that the purported settlement was never approved by the court, nor was approval ever sought. It acknowledged that the draft settlement stipulation was never executed.[32] CMC also conceded, as argued by the Debtors, that CMC's payment of $5,217.00 was the result of the court order granting the Debtors' unopposed Fee Motion. Under these circumstances, CMC's assertion that Debtors' claims were resolved by a settlement stipulation that was never approved by the court is factually preposterous. Moreover, to suggest that an unsigned, unapproved settlement agreement is enforceable comes dangerously close to being legally frivolous. Compare Shahrestani v. Alazzeh (In re Alazzeh), 509 B.R. 689 (9th Cir. BAP 2014)(informal agreement to extend discharge objection deadline under FRBP 4004 is ineffective if no formal stipulation is executed and approved by bankruptcy court).

Because the claims encompassed by the Sanctions Motion have not been resolved, the court will address them in the chronological order in which they could arise in the Debtors' now-reopened bankruptcy proceeding.

## APPLICABLE LEGAL STANDARDS

Section 362(k) provides for an award of actual damages for an individual injured by a willful violation of the automatic stay. Actual damages may include costs and attorneys' fees, and, in appropriate circumstances, punitive damages. See 11 U.S.C. § 362(k)(1). Actual damages may include compensation for emotional distress. Proof of pecuniary loss is not required for an award of emotional distress damages. See Dawson v. Washington Mutual Bank (In re Dawson), 390 F.3d 1139, 1149 (9th Cir. 2004). "To recover damages for emotional distress under § 362(k), 'an individual must (1) suffer significant harm (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process).' ... Emotional harm may be proved by: (1) medical evidence, (2) non-experts, such as family members, friends, or coworkers; or (3) 'even without corroborative evidence

---

**31.** Perhaps because CMC was asserting that the dispute had been settled, neither side objected under FRE 408(a) to admission of the evidence of the settlement communications between their counsel. (Exs. 54, 55, 56, 57, 58; Exs. F, G, H, and I).

**32.** The documentary evidence submitted by CMC demonstrates that counsel for the Debtors and CMC exchanged numerous emails over several months attempting to finalize a settlement stipulation but without reaching a final agreement. (Exs. G and I). The Smith Declaration that addressed counsel's settlement negotiations, however, was never offered or admitted into evidence, nor was attorney Smith ever called as a witness.

where significant emotion distress is readily apparent.' ... The last category includes cases where the violator's conduct is 'egregious,' or where the conduct is not egregious but the circumstances make it obvious that a reasonable person would suffer significant emotional harm ... 'Fleeting or trivial anxiety or distress does not suffice ...'" See America's Servicing Co. v. Schwartz–Tallard, 438 B.R. 313, 321–22 (D. Nev. 2010), citing In re Dawson, 390 F.3d at 1149–50.

■ An award of attorneys' fees under Section 362(k) may include the fees incurred in seeking to enforce the automatic stay, including on appeal, and is no longer limited to the attorneys' fees incurred up to the time the automatic stay violation ceases. See America's Servicing Co. v. Schwartz–Tallard (In re Schwartz–Tallard), 803 F.3d 1095, 1101 (9th Cir. 2015), overruling Sternberg v. Johnston (In re Sternberg), 595 F.3d 937 (9th Cir. 2010).

■ A prerequisite to awarding any actual or punitive damages under Section 362(k) is a finding that the creditor's violation of the automatic stay was willful. Proof of specific intent to violate the automatic stay is not required. See Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1191 (9th Cir. 2003). Instead, the moving party need only demonstrate that the creditor knew of the automatic stay, and that the creditor's actions that violated the stay were intentional. See Havelock v. Taxel (In re Pace), 67 F.3d 187, 191 (9th Cir. 1995). A party with knowledge of the bankruptcy proceeding is considered to have knowledge of the automatic stay. See Eden Place, LLC v. Perl (In re Perl), 513 B.R. 566, 576 (9th Cir. BAP 2014), rev'd on other grounds, 811 F.3d 1120 (9th Cir. 2016).

Section 524(a)(1) provides in relevant part that a bankruptcy discharge "voids any judgment at any time obtained, to the extent such judgment is a determination of the personal liability of the debtor with respect to any debt discharged ..." Section 524(a)(2) provides in relevant part that the bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, ... or an act, to collect, recover or offset any such debt as a personal liability of the debtor ..."

■ A debtor who asserts that the Discharge Injunction has been violated must seek relief from the bankruptcy court by motion rather than through commencement of an adversary proceeding. See Barrientos v. Wells Fargo Bank, N.A., 633 F.3d 1186, 1190 (9th Cir. 2011).

The Bankruptcy Appellate Panels for the Ninth Circuit ("BAP") summarized the standards applicable to the enforcement of the Discharge Injunction as follows:

> To be subject to sanctions for violating the discharge injunction, a party's violation must be "willful." The Ninth Circuit applies a two-part test to determine whether the willfulness standard has been met: (1) did the alleged offending party know that the discharge injunction applied; (2) and did such party intend the actions that violated the discharge injunction? In re Nash, 464 B.R. at 880 (citing Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193, 1205 n.7 (9th Cir.2008), aff'd, [559] U.S. [260], 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010); Zilog, Inc. v. Corning (In re Zilog, Inc.), 450 F.3d 996, 1007 (9th Cir.2006). For the second prong, the bankruptcy court's focus is not on the offending party's subjective beliefs or intent, but on whether the party's conduct in fact complied with the order at issue. Bassett v. Am. Gen. Fin. (In re Bassett), 255 B.R. 747, 758 (9th Cir. BAP 2000), rev'd on other grounds, 285 F.3d 882 (9th Cir.2002). "A party's negli-

gence or absence of intent to violate the discharge order is not a defense against a motion for contempt." *Jarvar v. Title Cash of Mont., Inc. (In re Jarvar)*, 422 B.R. 242, 250 (Bankr.D.Mont.2009)(citing *Atkins v. Martinez (In re Atkins)*, 176 B.R. 998, 1009–10 (Bankr.D.Minn. 1994)); *see also In re Sanburg [Sandburg ] Fin. Corp.*, 446 B.R. 793, 804 (S.D.Tex.2011)(that the offending party may have not understood its actions to violate the discharge injunction does not negate the willfulness finding, even if true).

The moving party must prove by clear and convincing evidence that the offending party violated the order. *In re Zilog, Inc.*, 450 F.3d at 1007; *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir.2003). The moving party also has this same burden to prove that sanctions are justified. *Espinosa*, 553 F.3d at 1205 n.7. The burden then shifts to the offending party to demonstrate why it was unable to comply. *In re Bennett*, 298 F.3d [1059] at 1069 [ (9th Cir.2002) ]. If a bankruptcy court finds that a party has willfully violated the discharge injunction, it may award actual damages, punitive damages and attorney's fees to the debtor. *In re Nash*, 464 B.R. at 880 (citing *Espinosa*, 553 F.3d at 1205 n.7 (citing 2 Collier Bankruptcy Manual ¶ 524.02[2][c] (3d rev. ed.))). The bankruptcy court has broad discretion in fashioning a remedy for violation of the discharge injunction.

*In re Bassett*, 255 B.R. at 758.

*Rosales v. Wallace (In re Wallace)*, 2012 WL 2401871 at \*5 (9th Cir. BAP June 26, 2012).[33]

▮▮▮▮ A bankruptcy court's civil contempt authority under Section 105(a) is limited to relatively mild, non-compensatory fines rather than serious punitive sanctions. See *Dyer*, 322 F.3d at 1193.[34] An award of attorneys' fees also is an appropriate component of a civil contempt award. See *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002). Because actual damages can include emotional distress damages for an automatic stay violation, see *Dawson*, 390 F.3d at 1148, courts also have authority to award emotional distress damages for a discharge violation. See *Green Point Credit, LLC v. McLean (In re McLean)*, 794 F.3d 1313, 1325 (11th Cir. 2015).

More recently, the BAP also observed as follows:

Taken together, *Bennett, Dyer*, and *Zilog*, demonstrate that the Ninth Circuit has crafted a strict standard for the actual knowledge requirement in the context of contempt before a finding of willfulness can be made. This standard requires evidence showing the alleged contemnor was aware of the discharge injunction *and* aware that it applied to his or her claim. Whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-

---

**33.** The summary cites, and is consistent with, the view previously expressed by the BAP in Nash v. Clark Cnty. Dist. Attorney's Office (In re Nash), 464 B.R. 874, 880 (9th Cir. BAP 2012). Although Nash was decided in 2012, neither Nash nor Espinosa addressed whether a bankruptcy court has authority under Section 105(a) to award punitive damages for contempt. That issue was decided in the negative by the Ninth Circuit in Dyer, and Dyer was not overruled by Espinosa.

**34.** The easy distinction between sanctions for violation of the automatic stay and sanctions for violation of a court order is that Section 362(k) expressly authorizes a bankruptcy court to award punitive damages, while Section 105(a) does not expressly authorize a bankruptcy court to punish a contemnor in a criminal fashion for violating a court order through an award of punitive damages. See Dyer, 322 F.3d at 1192.

based inquiry which implicates a party's subjective belief, even an unreasonable one. Of course, subjective self-serving testimony may not be enough to rebut actual knowledge when the undisputed facts show otherwise. *See Chionis v. Starkus (In re Chionis)*, BAP No. CC–12–1501–KuBaPa, 2013 WL 6840485, at *6 (9th Cir. BAP Dec. 27, 2013) (reversing the bankruptcy court's finding that actual knowledge of the discharge injunction was not shown based on alleged contemnor's self-serving testimony when the undisputed facts showed otherwise).

With respect to the second prong—the intent requirement for a finding of willfulness—the analysis concerning a "willful" violation of the discharge injunction is the same as a finding of willfulness in connection with violation of the automatic stay under § 362(k). In connection with the second prong's intent requirement, we have previously observed that "the bankruptcy court's focus is not on the offending party's subjective beliefs or intent, but on whether the party's conduct in fact complied with the order at issue." *Rosales v. Wallace (In re Wallace)*, BAP No. NV–11–1681–KiPaD, 2012 WL 2401871, at *5 (9th Cir. BAP June 26, 2012) (citing *Bassett v. Am. Gen. Fin. (In re Bassett)*, 255 B.R. 747, 758 (9th Cir. BAP 2000), *rev'd on other grounds*, 285 F.3d 882 (9th Cir. 2002) (stating that courts have applied an objective test in determining whether an injunction should be enforced via contempt power) (citing *In re Hardy*, 97 F.3d [1384] at 1390 [ (11th Cir.1996) ]); *see also In re Dyer*, 322 F.3d at 1191 (noting that a "willful viola-

tion" does not require a specific intent to violate the automatic stay).

Accordingly, each prong of the Ninth Circuit's two-part test for a finding of contempt in the context of a discharge violation requires a different analysis, and distinct, clear, and convincing evidence supporting the analysis, before a finding of willfulness can be made.

*Emmert v. Taggart (In re Taggart)*, 548 B.R. 275, 288 (9th Cir. BAP 2016).[35]

## DISCUSSION

Debtors allege that CMC violated the automatic stay as to the collection of its claim under the Adjustable Note and as to the enforcement of its lien against the 36th Street Property. Debtors also maintain that CMC violated the Confirmation Order by unilaterally imposing a payment requirement of $547.40 each month rather than $465.20 each month. Finally, Debtors assert that CMC violated the Discharge Order and Discharge Injunction by attempting to collect the full amount of the Adjustable Note.

### I. The Automatic Stay.

The automatic stay arose immediately upon the filing of the Debtors' bankruptcy petitions on May 1, 2009. Under Section 362(a)(6), the automatic stay precludes any act to collect, assess, or recover any prepetition claim against the debtors. Under Section 362(a)(4), the automatic stay precludes any act to enforce any lien against property of the estate. Under Section 362(c)(2)(C), the automatic stay terminates as to the debtors at the time the bankruptcy case is closed, dismissed, or a discharge

---

**35.** The <u>Taggart</u> panel also noted that:

The clear and convincing evidence standard requires the moving party to "place in the ultimate factfinder an abiding conviction that the trust of its factual contentions are 'highly probable.' "... Factual contentions are highly probable if the evidence offered in support of them "instantly tilt[s] the evidentiary scales in the affirmative when weighed against the evidence [the non-moving party] offered in opposition."

548 B.R. at 288 n.11 (citations omitted).

is granted or denied. Under Section 362(c)(1), the automatic stay terminates as to property of the estate at the time the property is no longer property of the estate.

CMC clearly knew of the Debtors' bankruptcy filing and therefore had knowledge of the automatic stay. The automatic stay terminated as to the Debtors on June 18, 2012, when they received their Chapter 11 discharge, and their case had not been closed or dismissed.[36] As to the 36th Street Property, the automatic stay terminated on June 14, 2011, when the Third Amended Joint Plan of Reorganization was confirmed, vesting the property in the Debtors. When CMC foreclosed on the 36th Street Property after confirmation of the Third Amended Joint Plan of Reorganization, the automatic stay already had terminated as a matter of law because the property was no longer property of the bankruptcy estate. As a result, no violation of the automatic stay occurred at that time as to the 36th Street Property.

As to the Debtors, the inquiry under Section 362(k) is whether CMC engaged in any act to collect, assess, or recover their claim under the Adjustable Note between May 1, 2009 and June 18, 2012. Debtors argue that CMC violated the automatic stay by making collection calls and by sending certain correspondence during that period. Debtors argue that the collection calls occurred over a sixteen-week period between June 14, 2011 and October 1, 2011. See Debtors' Closing Brief at ¶ 33. Debtors also maintain that CMC sent numerous Rate Adjustment Letters (Exs. 73 through 81, and 83 through 111) between May 19, 2009 and May 18, 2012, that vio-

lated the automatic stay. Id. at ¶¶ 30 and 31.

Martinez testified that he received three calls per week from CMC after the bankruptcy was filed. As discussed above, Debtors argue that those calls occurred over a sixteen-week period between June 14, 2011 and October 1, 2011. Martinez was protected by the automatic stay until he, along with Flores, received their bankruptcy discharge on June 18, 2012. Flores also testified that he received three calls per week from CMC, but he also stated that those calls did not start until after his birthday in October 2012. Assuming those calls occurred, none of them were during the period in which Flores was protected by the automatic stay because Flores already had received his Chapter 11 discharge.

Martinez testified specifically as to the two Rate Adjustment Letters that he received dated in October and November 2009, as well as two additional Rate Adjustment Letters that he received dated in April and May 2012. Martinez did not testify specifically as to the 36 other Rate Adjustment Letters admitted into evidence, but recalled that he received such letters from CMC every month during the bankruptcy case. Flores did not testify as to any of the Rate Adjustment Letters.

## A. Willful Violations.

For purposes of this analysis, the court assumes that Martinez received forty-eight phone calls from CMC after the bankruptcy petition was filed and before the discharge was received. The court also assumes for purposes of this analysis, that each of the calls sought to collect the original amount of the Adjustable Note. The

---

**36.** Some individual Chapter 11 debtors obtain orders closing their cases before receiving their discharge so as to prevent payment of fees to the Office of the United States Trustee. By doing so, they risk terminating the protec-

tion of the automatic stay under Section 362(c)(2)(A) without yet having obtained the protection of the discharge injunction under Section 524(a)(2).

court further assumes for purposes of this analysis that CMC intended to make each of the forty-eight phone calls to Martinez. Based on those assumptions, the court concludes that there was a willful violation of the automatic stay as to Martinez. Because Flores did not receive any phone calls from CMC until after the discharge was entered, the court also concludes that there was no willful violation of the automatic stay as to Flores.

■ For purposes of this analysis, the court assumes that Martinez received each of the Rate Adjustment Letters sent by CMC, and that Flores received none of them. The court having reviewed each of the Rate Adjustment Letters, however, concludes that none of them demands payment of the Adjustable Note. Instead, each of the Rate Adjustment Letters simply informs the Debtors of the monthly payments that would be required at the time under the terms of the Adjustable Note. The word "due" appears in each of the letters, but only to explain that no adjustment to the monthly payment is due rather than to state that a payment in any amount is due. There is no express statement in any of the Rate Adjustment Letters that CMC is attempting to collect a debt. Rather, the letters provide information that would be equivalent to that provided outside of bankruptcy, and do not demand payment separate from a monthly mortgage statement. Under these circumstances, the court concludes that CMC's issuance of these Rate Adjustment Letters did not constitute willful violations of the automatic stay as to either of the Debtors. Compare In re Lemieux, 520 B.R. 361, 366–67 (Bankr. D. Mass. 2014)(post-discharge notice of change in loan interest rate did not violate discharge injunction).

## B. Actual Damages.

■ Martinez testified that he received the forty-eight phone calls from CMC, but offered no testimony or documentary evidence establishing that he missed time from work or incurred any medical or legal expenses as a result. He suffered no pecuniary losses which, by itself, does not preclude the recovery of emotional distress damages as a component of actual damages. Martinez's testimony at trial, however, was that the bankruptcy process itself was very stressful, which caused him to lose focus at work.

Martinez also testified that after the NOD was recorded by CMC, it caused him to lose sleep, created problems taking care of customers at work, and led to fights with his partner, Flores. The NOD, however, was recorded well after Martinez received his discharge and the automatic stay had expired.

As previously discussed, the recovery of emotional distress damages under Section 362(k) requires proof that the stay violation caused significant harm distinct from the anxiety and inherent pressure of the bankruptcy process. See discussion at 156, supra. In this case, Martinez, along with Flores, voluntarily filed Chapter 11 reorganization proceedings that were significantly more complex than typical consumer Chapter 7 liquidation or Chapter 13 debt adjustment cases. Debtors' first attempt to confirm a Chapter 11 plan of reorganization failed primarily due to the objections raised by the UST. Only after the Debtors made a second attempt to confirm a Chapter 11 plan, were they successful. In other words, a complex bankruptcy process was made even more difficult because the Debtors had to address issues and parties that they could not control.

No medical evidence was offered and no percipient witness testimony was adduced inferring that Martinez experienced any additional anxiety or stress as a result of

any calls from CMC. Not even Flores testified that Martinez exhibited any additional strain caused by the calls. According to Flores, the Debtors never informed their bankruptcy attorney about calls from CMC until after they received their discharge. Unlike Flores, there is no evidence that Martinez sought professional treatment for depression or was prescribed antidepressants as a result of either the commencement of the Chapter 11 proceedings or the actions of CMC. In short, the evidence is insufficient to conclude that Martinez suffered emotional distress separate and apart from, and distinct from, the anxiety of the very bankruptcy process he chose.

Under these circumstances, the court concludes that Martinez has failed to establish that he suffered any actual damages, both monetary and non-monetary, as a result of any willful violation of the automatic stay by CMC.

## II. The Confirmation Order.

CMC maintains that the $465.20 monthly payment amount was "self-selected" by the Debtors and not ordered by the court. See CMC Closing Brief at 2:3–7 & n.1. CMC also contends that after it changed the payment amount to $547.40 per month, it was the Debtors' responsibility to ask CMC to provide an explanation. Id. at 2:7–9 & n.2. Doubling down, CMC further argues that it "is not responsible for Debtors' failure to recognize that their plan payment is higher than their self-selected adequate protection." Id. at 2:9–10.

Debtors argue that CMC violated the Confirmation Order after its entry on June 14, 2011, by sending twelve Rate Adjustment Letters through May 18, 2011, that included unpaid principal balances that conflict with the Confirmation Order. See

Debtors' Closing Brief at ¶ 31. They argue that CMC sent fifteen additional letters and notices leading up to the foreclosure of the 36th Street Property. Id. at ¶ 32.[37] Debtors also maintain that CMC violated the Confirmation Order through phone calls to the Debtors seeking the full amount of the Adjustable Note balance after the order was entered, as well as after the Discharge Order was entered. Id. at ¶ 33.

### A. Willful Violation.

At the evidentiary hearing, CMC attempted to establish through its examination of Martinez, that the $465.20 monthly payment was not required by the language of the confirmed plan. Martinez's partner, Flores, was not examined on the subject, and CMC's only witness, McPherson, also did not address the subject on direct or cross-examination. No one from CMC who had personal knowledge of the servicing of the Debtors' obligation was called to testify. CMC's only witness, McPherson, did not dispute that CMC had notice of the Debtors' reorganization proceeding, actually participated in the confirmation process, and had notice of all of the documents filed in the Chapter 11 case. Because McPherson relied solely on the records prepared by other CMC employees, he had no personal knowledge of whether CMC's employees even read the bankruptcy information in the loan file. Thus, to the extent that the amount of the monthly payment required by the confirmed plan is a factual issue instead of a legal one, the witness testimony infers that CMC, rather than the Debtors, failed to take reasonable steps to comply with the requirements of the Confirmation Order.

All of the Chapter 11 reorganization plans proposed by the Debtors referenced a Cash Flow Analysis setting forth their

---

37. Those fifteen additional letters include two

Rate Adjustment Letters (Exs. 71 and 72).

proposed monthly payments to all of their secured creditors. Debtors' source of plan payments was always their monthly rental income as well as their income from employment. Their monthly mortgage payments were always to be based on the reduced value of their rental properties, including the 36th Street Property, as determined by the court.

At the inception of the Chapter 11 proceedings, Debtors filed the Valuation Motion by which the court determined the fair market value of the 36th Street Property to be $120,000. That valuation resulted in an allowed secured claim in that amount in favor of CMC, with an allowed unsecured claim for the balance owed on the Adjustable Note. CMC was served with the Valuation Motion and never opposed it. It did not appeal the order granting the motion. Instead, CMC filed its POC for the full amount of the Adjustable Note balance and more.[38]

CMC was served with all of the Chapter 11 reorganization plans proposed by the Debtors as well as the Chapter 11 disclosure statements that included the Cash Flow Analysis. It never objected to the proposed monthly payment of $465.20 set forth in the Cash Flow Analysis and never

objected to confirmation of proposed Third Amended Joint Plan of Reorganization, nor the amendment proposed in the Fourth Amended Joint Plan of Reorganization.

CMC actively participated in the Chapter 11 proceeding and was represented by counsel. It administered the Adjustable Note throughout the bankruptcy on behalf of the investor holding the interest in the note, and its loan files included the note, the deed of trust, the title policy, any loan modification, and any cramdown information and other bankruptcy data. CMC provided all of that information to its foreclosure trustee.

The Confirmation Order entered on June 14, 2011, approved the Third Amended Joint Plan of Reorganization, including the payments set forth in the Cash Flow Analysis. CMC was served with a copy of the Confirmation Order and never appealed the order. The Plan Modification Order entered on October 25, 2011, approved the Fourth Amended Joint Plan of Reorganization, including the payments set forth in the Cash Flow Analysis. CMC was served with a copy of the Plan Modification Order and never appealed the order.

---

**38.** In its post-trial brief, CMC argues that the Debtors never sought court approval of their use of cash collateral in order to make the "self-selected adequate protection payment of $465.20" based on a $120,000 secured claim. See CMC Closing Brief at 2 n.1. This is an odd objection to make more than seven years after the Debtors' Chapter 11 petitions were filed and when CMC undisputedly had notice of the bankruptcy proceedings from day one. Despite having notice of the bankruptcy proceedings and actively participating in the case, there is no record of CMC ever objecting to the Debtors' use of cash collateral. Even more curious is that CMC cites no language in the Adjustable Note or the Deed of Trust attached to its POC that would establish its interest in the rents generated by the 36th Street Property. Paragraph 11 of the Deed of

Trust does include an assignment of "Miscellaneous Proceeds," but the description of Miscellaneous Proceeds found in Definition (M) of the Deed of Trust does not include rents. On most occasions, an assignment of rents provision is boldly stated, included in the title of a deed of trust, or accompanies the deed of trust as a separately recorded document. Perhaps the court overlooked the rent assignment language in the Deed of Trust, but probably not. So just what interest of CMC in the 36th Street Property constituted "cash collateral" under Section 363(a) entitling it to adequate protection under Section 363(e) as required by Section 363(c)(2)(B)? This appears to be another baffling position taken by CMC similar to its assertion that the Debtors' claims were settled.

In spite of having the Debtors' bankruptcy information in its loan file, including the Confirmation Order and the Plan Modification Order approving the Debtors' monthly payment of $465.20 on CMC's allowed secured claim, CMC changed the payment amount to $547.40 on August 17, 2012, without any court order authorizing it to do so, and made that change retroactive to November 1, 2011. CMC's only witness did not know how CMC made that decision and could provide no evidence that CMC was unable to comply with the Confirmation Order. Its witness did not testify to any efforts being made by CMC to review the bankruptcy data in its loan file, to examine the records of the bankruptcy court, to seek advice from its bankruptcy counsel, or to even seek advice from the witness, before deciding after four years of accepting the Debtors' payments to change the amount required by the Confirmation Order. Additionally, CMC never notified the Debtors why it made the change or how the additional payment amount was determined. During the same period of time, CMC continued to send the Rate Adjustment Letters to the Debtors each month that provided information regarding the monthly payment amounts that would have been required by the terms of the original Adjustable Note. In fact, the Rate Adjustment Letters encompassing the November 1, 2011, retroactive adjustment date expressly informed the Debtors that the monthly payment amount under the Adjustable Note would not change.[39] Thus, for some reason, someone at CMC apparently came to the conclusion that what it could not do under the terms of the Adjustable Note, i.e., adjust the required monthly payments without giving prior notice to the borrowers, it somehow could do to monthly payments specified under a confirmed Chapter 11 plan.[40]

The notion that CMC could unilaterally change the amount of the payment under the confirmed plan without prior notice to the Debtors is contradicted by CMC's own legal position. In its written response to the Sanctions Motion, CMC expressed its own understanding of the Confirmation Order as follows:

> The Plan left little guidance as to the specific terms of the re-amortization of the Loan, excepting that "Class 2(f) Secured Claim shall be impaired and paid the allowed amount of its claim [$120,000] in accordance with the terms of its related note and mortgage." Thus, there was in fact no modification to CMC's Loan except that the Plan reduced the principal balance of the Loan to $120,000.

CMC Opposition at 4:23–28 (Emphasis added). Apparently, CMC is unaware of the requirements of the very loan that it is servicing in this case. The loan documents were attached as exhibits to its POC. Those documents consist of the Deed of Trust, an Adjustable Rate Rider, a Condominium Rider, and the Adjustable Note.

---

**39.** The Rate Adjustment Letters dated in May, June, July, August, September, October, November, and December, 2011, all explained that the Debtors' monthly payment under the Adjustable Note would remain at $1,362.11. (Exs. 93, 92, 91, 90, 89, 87, and 86).

**40.** CMC's suggestion that it made a good faith interpretation of the Confirmation Order, see CMC Closing Brief at 10:11–18, is contrary to the testimony of its own witness who did not even know how CMC made its determination on August 17, 2012, to increase the monthly payment and apply it retroactively to November 1, 2011. Moreover, CMC offered no evidence suggesting that its employees reviewed any of the bankruptcy documents in the loan file, sought any information from the case docket, or even consulted with its bankruptcy attorneys and in-house counsel.

Section 2 of the Adjustable Note sets forth the method by which changes in the interest rate are to be calculated by the lender, and Section 3 sets forth the borrower's obligation to make the monthly payment in accordance with the adjusted interest rate. Section 4 of the Adjustable Note specifies that the lender will provide notice to the borrower "of any change in the amount of my monthly payment before the effective date of the change." Section 4 also provides that the notice "will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice." The language in Sections 2, 3, and 4 of the Adjustable Note are so important that identical or substantially identical language was included in the Adjustable Rate Rider and the Debtors were required to initial each page. The purpose of Section 4 was to let the consumer borrower know in advance that his or her loan payments would change and to provide a contact person to answer any questions. The obvious goal was to provide transparency to prevent misunderstandings between the lender and the borrower. Because CMC takes the position that the confirmed plan reduced the principal balance of the Debtors' obligation to $120,000, but made no other modification to the loan, it cannot claim that it could unilaterally make any changes in the amount of the monthly payments without giving prior notice.

Under these circumstances, CMC's assertion that the Confirmation Order did not provide for a monthly payment of $465.20, is contrary to the record. Additionally, its assertion that it did not understand that the $465.20 amount was required by the Confirmation Order, is not credible. More important, its assertion that it was not required to comply with the notice requirements of its loan documents is factually unsupportable. The notion that a loan servicer can unilaterally change the amount of the monthly payment on a consumer loan without notice or explanation, especially in a bankruptcy setting, is risible at best. CMC's additional suggestion that the Debtors had the burden of seeking an explanation for the payment change in this case, while CMC simultaneously is sending Rate Adjustment Letters in connection with the Adjustable Note, is even worse. To the extent that CMC had the burden of demonstrating that it was unable to comply with the Confirmation Order, it utterly failed to meet that burden.

Clear and convincing evidence establishes that CMC violated the Confirmation Order when it unilaterally increased the monthly payment amount and then retroactively applied the amount to the allowed secured claim that was crammed down by the Debtors' confirmed plan. The record also establishes that CMC had the ability to comply with the Confirmation Order, but it offered no evidence that it was unable to comply. The court therefore concludes that a willful violation of the Confirmation Order has been established.

### B. Actual Damages.

[16] The Confirmation Order was entered on June 14, 2011. The order specified that the Debtors' monthly payment on CMC's allowed secured claim as crammed down under the confirmed plan would be $465.20. The record establishes that CMC accepted those payments for years before starting to reject those payments in August 2013. Additionally, the Payment History indicates that CMC did not unilaterally change the monthly plan payment to $547.40 until August 17, 2012. No contrary evidence was presented as to the date CMC unilaterally changed and retroactively applied the increased monthly payment amount. The court therefore will use the August 17, 2012 date as the beginning

point to measure the Debtors' actual damages, if any, caused by CMC's violation of the Confirmation Order.

CMC initially argued that there is no evidence of any damages suffered by the Debtors. See CMC Closing Brief at 2:15–17. This argument is, of course, incorrect because both Debtors provided written and oral testimony in support of their claims of emotional distress. At closing argument, CMC changed its position to assert that no significant or substantial damages had occurred, rather than that there was no evidence of any damages.

After the Confirmation Order was entered, the twenty-seven letters and notices received from CMC included fourteen Rate Adjustment Letters. While each of the Rate Adjustment Letters includes an unpaid principal balance amount that would be owed on the original Adjustable Note, none of them state that the principal balance of the Adjustable Note is owed or that a payment is due. As the court previously concluded in connection with the alleged automatic stay violation, see discussion at 160–61, supra, the court similarly concludes that the fourteen Rate Adjustment Letters did not violate the Confirmation Order. The remaining letters and notices sent by CMC, however, are much different.

The other letters and documents included: a copy of the NOD that was addressed to the tenants at the 36th Street Property (Ex. 23); a copy of the Notice of Sale (Ex. 40); copies of the May 12, 2014 (Ex. 62), July 8, 2014 (Ex. 61), and August 11, 2014 (Ex. 60) letters returning the Debtors' monthly payments and notifying them that their loan had been referred to CMC's legal counsel to begin foreclosure proceedings; copies of the February 4, 2014 letters sent to four different addresses declaring a breach of the Adjustable Note and Deed of Trust (Exs. 64, 65, 66; and

67); a copy of the February 10, 2014 letter returning an electronic payment of $465.20 stating that there are late charges and other amounts due totaling $199.22 (Ex. 63); and copies of the August 8, 2013 (Ex. 70), November 7, 2013 (Ex. 69), and January 9, 2014 (Ex. 68) letters stating that there are unapplied balances and that CMC cannot post the balances because they are less than the payments due.

All of these letters and notices were sent to the Debtors as a result of CMC's unilateral change to the monthly payment. There is no dispute, however, that all of these letters and notices were sent to the Debtors after the Discharge Order was entered. To avoid duplicating any award of actual damages, the court will address below the post-confirmation letters and notices in connection with the violation of the Discharge Order and Discharge Injunction, if any.

After the Confirmation Order was entered, Debtors argue that they received three phone calls each week through October 1, 2011. See Debtors' Closing Brief at ¶ 33.i. They also argue that they received three phone calls per week after they received their discharge (June 18, 2012), starting after Flores's birthday in October 2012. Id. at ¶ 33.ii. As previously discussed, Flores testified that he never received any calls from CMC until two weeks after his birthday, which was well after he received his discharge. To avoid any duplication of damages, the court therefore will address the post-confirmation calls to Flores in connection with the violation of the Discharge Order and Discharge Injunction, if any. The court will do the same with respect to any post-confirmation calls made to Martinez after entry of the Discharge Order.

As to the post-confirmation calls made by CMC to Martinez through October 1, 2011, i.e., prior to the discharge, the court

already has concluded that Martinez has failed to establish that he suffered any actual damages, both monetary and non-monetary, resulting from the alleged automatic stay violation. See discussion at 161–62, supra. The causation analysis required to award damages for an automatic stay violation is equally applicable when the beneficiary of a court order seeks damages for violation of the order.[41] Here, there is no evidence that CMC's post-confirmation calls to Martinez, if any, were the cause of any monetary injuries such as lost wages or medical expenses. Additionally, there is no specific testimony from Martinez, nor corroborating testimony from Flores, other friends and co-workers, or medical providers, that the calls received after the Confirmation Order was entered, produced anxiety or stress exceeding the emotional burden resulting from the Chapter 11 process itself. In this individual Chapter 11 case, confirmation of the Chapter 11 plan did not relieve the Debtors of their obligation to make the required payments on the allowed secured claim in order to eventually obtain removal of the lien against the 36th Street Property. Moreover, confirmation of the Chapter 11 plan also did not relieve the Debtors of their obligation to complete all plan payments in order to obtain their discharge.

Under these circumstances, the court concludes that Martinez has not met his burden of proving that the post-confirmation calls from CMC, if any, were the cause of any emotional distress sufficient to warrant compensation. In short, no actual damages for violation of the Confirmation Order are appropriate.

## III. The Discharge Order and Discharge Injunction.

The Discharge Order entered on June 18, 2012, was straightforward: it granted a discharge to both Martinez and Flores under Section 1141(d). Other than the bankruptcy discharge, the order grants no other relief. As previously discussed, however, the discharge triggered certain statutory consequences, including the Discharge Injunction. Because the Discharge Order provides no additional relief, the court will address only whether CMC violated the Discharge Injunction.

### A. Willful Violation.

As discussed above, the standard in this circuit for finding a willful violation of the Discharge Injunction requires an analysis of two prongs.

### 1. Did CMC have knowledge that the discharge injunction applied to its claim?

■ The evidence is clear and convincing that CMC knew that the Discharge Injunction applied to its claim. CMC knew that the Debtors filed for Chapter 11 relief. CMC was scheduled as a secured creditor in both Chapter 11 proceedings.

CMC was served with the Debtors' jointly proposed Chapter 11 plans of reorganization that provided for CMC to retain its lien against the 36th Street Property and for its secured claim to be allowed in the revalued amount of $120,000. Like all individual Chapter 11 debtors, the proposed plans provided that the Debtors would not receive a discharge of their personal liability on CMC's claims until completion of plan payments. CMC was served with the disclosure statements that includ-

---

**41.** A causation analysis is less important, and perhaps inapplicable, when a court criminally sanctions a party for violating a court order. In those circumstances, the sanction is designed to punish the offending party in order to preserve the court's judicial authority. In those circumstances, a willful violation of the order itself causes damage to the court's authority.

ed the Debtors' Cash Flow Analysis setting forth the proposed amount of the $465.20 monthly mortgage payment based on the allowed secured claim.

CMC was an active participant in the Debtors' case. It filed its POC in the secured amount of $299,788.72. It filed a motion for relief from stay alleging that it was owed $305,587.20 as of December 29, 2009. See CMC Lift Stay Motion at ¶ 5. It objected to confirmation of the Debtors' Second Amended Plan of Reorganization as well as approval of the Second Amended Disclosure Statement, but not to the $465.20 proposed monthly mortgage payment set forth in the Cash Flow Analysis.

CMC was served with the Third Amended Joint Plan of Reorganization as well as the Third Amended Joint Disclosure Statement. The identical Cash Flow Analysis was incorporated in the Third Amended Joint Disclosure Statement, but CMC did not object to plan confirmation, including the proposed monthly mortgage payment.

CMC was served with notice of the Confirmation Order that expressly discussed the Cash Flow Analysis in support of plan feasibility. CMC did not appeal the Confirmation Order, and it continued to receive and accept payments of $465.20 per month after the Chapter 11 plan was confirmed.

CMC was served with the motion for entry of a final decree and an order of discharge. The Discharge Order was entered on June 18, 2012, and CMC did not appeal the entry of discharge.

Having received notice of the Chapter 11 proceedings, having filed a POC for the balance of the Adjustable Note, having sought relief from the automatic stay, having participated in the plan confirmation process, having received the Confirmation Order, and having received the Discharge Order, CMC clearly knew that the Discharge Injunction applied to its claim under the Adjustable Note.[42] While CMC disputes that it violated the Discharge Injunction, that dispute is immaterial to whether it had knowledge of its applicability to its claim. Thus, the first prong of the Ninth Circuit standard for a finding of willfulness has been met.

### 2. Did CMC intend the actions that violated the discharge injunction?

As previously discussed, the Debtors' discharge did not eliminate CMC's lien against the 36th Street Property, but it did eliminate the Debtors' personal liability for the Adjustable Note pursuant to Sections 1141(d)(1) and 1141(d)(5). As a result, the Discharge Injunction prohibited any "act, to collect, recover or offset any such debt as a personal liability of the debtor . . ." 11 U.S.C. § 524(a)(2).

After the Debtors received their discharge, CMC continued to receive and accept payments of $465.20 per month. On August 17, 2012, however, more than a year after the Debtors' Chapter 11 plan was confirmed and nearly two months after the Debtors received their discharge, CMC came to the conclusion that the $465.20 monthly payments were insufficient. It then changed the monthly payment to $547.40 and applied that payment

**42.** CMC does not assert that it relied in good faith on a judicial determination that its claim had not been discharged. Compare In re Gubler, Case No. 12–16811–MKN, Memorandum on Debtor's Motion to Reopen Chapter 7 Under § 350 and F.R.B.P. 5010 to Hold Creditors in Contempt and an Order Sanctioning the Creditors for Violation of the Discharge Injunction 11 U.S.C. § 524(a)(2), at pp. 14–15 and 22, Docket No. 27, entered April 20, 2016 (Spraker, J.) (finding, inter alia, that individual creditors reasonably relied on a state court's erroneous pronouncements that their unscheduled debt had not been discharged by the debtor's prior no-asset Chapter 7).

amount retroactively to November 1, 2011, without telling the Debtors that it had done so.

Almost a year later, CMC mailed the Debtors a letter dated August 8, 2013, in which it finally mentioned that the monthly payment amount was $547.40. The August 8, 2013 letter did not explain how the monthly payment amount of $547.40 was determined; it only stated that the payment of $465.20 left a balance due of $82.20. As previously discussed, during the Debtors' Chapter 11 proceeding, CMC continued to send the Rate Adjustment Letters each month. Out of all of the Rate Adjustment Letters admitted into evidence, only the February 18, 2010 letter (Ex. 108) stated that the monthly payment under the original Adjustable Note would have increased by approximately $52.00, and only the February 16, 2012 letter (Ex. 84) stated that the monthly payment under the Adjustable Note would have decreased by approximately $21.00. All of the Rate Adjustment Letters provided information explaining how any monthly payment adjustment was calculated. If the Debtors would have had to increase their monthly payment under the Adjustable Note, they were notified in advance. If the Debtors would have had to decrease their monthly payment under the Adjustable Note, they were notified in advance. However, no

such information was included in the August 8, 2013 letter. Moreover, CMC never explained in the August 8, 2013 letter that it had retroactively applied the increased payment amount to November 1, 2011, and that it would continue to do so.

After August 8, 2013, CMC considered the Debtors to be in default on payment of the allowed secured claim that had been crammed down by the Confirmation Order,[43] and CMC admittedly commenced making telephone calls to the Debtors. CMC continued to assert that monthly payments of $547.40 were required, creating a shortfall each month of $82.20. It admittedly never notified the Debtors how the new payment amount was determined or how the monthly payments were being applied. CMC then started rejecting the Debtors' monthly plan payments, again without explaining why the monthly payments provided under the confirmed plan suddenly were insufficient.[44]

CMC's foreclosure trustee, Northwest Trustee Services, recorded the NOD setting forth an arrearage amount of $2,378.43 that was based on the loan delinquency information obtained from CMC. The NOD also referred to the original Adjustable Note amount of $264,000, rather than the allowed secured claim amount crammed down by the confirmed plan. Un-

---

43. As previously identified in connection with the Confirmation Order, see discussion at 166, supra, the other letters and documents sent to the Debtors by CMC included: a copy of the NOD that was addressed to the tenants at the 36th Street Property; a copy of the Notice of Sale; copies of the May 12, 2014, July 8, 2014, and August 11, 2014 letters returning the Debtors' monthly payments; copies of the February 4, 2014 letters sent to four different addresses declaring a breach of the Adjustable Note and Deed of Trust; a copy of the February 10, 2014 letter returning an electronic payment of $465.20; and copies of the August 8, 2013, November 7, 2013, and January 9, 2014 letters stating that there are

unapplied balances and that CMC cannot post the balances because they are less than the payments due.

44. McPherson testified that the "call campaign" commenced at the time the August 8, 2013 letter was sent, but he also attested that CMC's phone records showed that CMC never spoke to the Debtors. Debtors, of course, testified that they spoke many times to representatives of CMC. If McPherson is correct, then CMC never provided an oral explanation to the Debtors as to how it recalculated the monthly payment amount after accepting the $465.20 payments for more than four years.

der the signature line of the three-page NOD appeared the words, in capital letters: "THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." Immediately below those capitalized words appeared the following additional language, in much smaller print: "If you have received a discharge of the debt referenced herein in a bankruptcy proceeding, this notice does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, a secured party retains rights under its security instrument, including the right to foreclose its lien."[45]

After recording the NOD emphasizing that it was attempting to collect a debt, CMC's foreclosure trustee subsequently recorded the two-page Notice of Sale that sets forth a total unpaid balance amount of $104,346.49, that made no reference to the original Adjustable Note amount, and that stated in capital letters at the bottom of the last page: 'THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." Unlike the NOD, however, the Notice of Sale does not disclaim that the sale is part of an attempt to collect a debt as a personal liability of the borrowers. In other words, the Notice of Sale announces, without limitation, that the foreclosure trustee is attempting to collect a debt in the amount of $104,346.49 owed by the trustors, Martinez and Flores.

Both prior to the foreclosure sale and even after the foreclosure sale, Debtors testified that they received calls from CMC, or someone on behalf of CMC, seeking to collect from the Debtors personally, either the full amount of the Adjustable Note or up to $80,000. Debtors allege that each of them received three post-discharge calls per week beginning shortly after Flores's birthday on October 5, 2012, through the foreclosure sale date of August 11, 2014. See Debtors' Closing Brief at ¶ 33.ii.

Because the NOD references the full amount of the Adjustable Note rather than the allowed secured claim crammed down by the confirmed Chapter 11 plan, because the Notice of Sale seeks to foreclose on the balance of the allowed secured claim without limitation, and because they received numerous phone calls seeking up to the full amount of the Adjustable Note; Debtors maintain that CMC's intentional actions violated the Discharge Injunction.

CMC, of course, maintains that it did not attempt to collect either the remaining balance of the Adjustable Note or the unpaid balance of its allowed secured claim. It denies making any of the post-discharge collections calls alleged by the Debtors to have occurred either before or after the foreclosure of the 36th Street Property. CMC's primary evidence consists of the testimony of its only witness.

McPherson testified at length, both in writing and in open court, in response to the Debtors' claims. As previously mentioned at note 10, supra, McPherson does not appear to have been the author of his own declaration, but instead was the CMC officer responsible for reviewing it, signing it, and defending it in court. Unfortunate-

---

45. At the time the foreclosure trustee recorded the NOD, there is no question that the Debtors already had received a discharge, and McPherson testified that a variety of bankruptcy information would have been provided by CMC to Northwest Trustee Services.

When a creditor already knows that a debt has been discharged, inclusion of the phrase "If you received a discharge" serves only to create doubt in the mind of a consumer debtor that bankruptcy has provided relief from his or her creditors.

ly, McPherson admittedly has no personal knowledge of how CMC decided to recalculate the monthly mortgage payments after accepting them for more than four years. Surely someone at CMC, but not McPherson, actually made that decision and could have testified on personal knowledge how the decision came about.

It also appears that McPherson does not know who prepared the prior Payment History even though his employer previously submitted it as proof of CMC's servicing of the Debtors' loan, and he clearly did not prepare the Post-petition Loan History that proved to be materially inaccurate. Surely someone at CMC, but not McPherson, actually prepared both documents and could testify on personal knowledge how the documents were prepared and could explain why certain information was omitted.

McPherson also testified that he reviewed CMC's call log (which was never produced by CMC in discovery), but he was not asked to explain how CMC generates, updates, maintains, and secures its phone records. Surely someone at CMC, but not McPherson, actually knows and could have testified on personal knowledge regarding CMC's protocol to assure the accuracy of its phone records and how call information is inserted into the comment history of the loan records. Based on his review of the call log (or perhaps the comment history), McPherson did testify that CMC had four different phone numbers for the Debtors, that CMC started a call campaign in August 2013, and that CMC never talked to the Debtors. However, that testimony contradicted CMC's representations to its foreclosure trustee. In seeking issuance of the NOD, CMC's lead foreclosure employee represented under penalty of perjury on April 1, 2014, that CMC had no telephone numbers by which to contact the Debtors. See discussion at 154 & n.28.

Assuming the testimony of CMC's lead foreclosure employee was not some humor-challenged April Fool's Day prank, CMC's phone records, therefore, do not appear to be any more reliable than its Post-petition Loan History.

█ McPherson testified, without contradiction, that California is an anti-deficiency jurisdiction that does not permit a lender recourse against its borrower once a non-judicial foreclosure on residential property is completed. He therefore suggested that CMC would have no reason to seek a personal judgment against the Debtors for any balance of the Adjustable Note, or the unpaid balance of the allowed secured claim for that matter, once the foreclosure sale was completed. That suggestion, however, misses the point of the discharge. Under Section 524(a)(2), the discharge operates as an injunction against any act by a creditor to recover a debt as a personal liability of the debtor, not just successful acts. Thus, whether a creditor could actually subject a debtor to personal liability for a discharged debt or a non-recourse debt is immaterial to whether the threat of such liability violates the Discharge Injunction. The fresh start intended by the discharge would be meaningless if a debtor has to continue fending off legally unenforceable claims. Compare In re Nordlund, 494 B.R. 507, 523 (Bankr. E.D. Cal. 2011)("One of the benefits an individual receives from a discharge is peace of mind. The individual need no longer be concerned that a discharged debt will be enforced against him or her. When a creditor disregards the discharge and attempts to collect a debt, it is certainly within the realm of possibility that the debtor will be harmed emotionally. When such occurs, the harm may be remedied.").

Moreover, while McPherson was correct about the California anti-deficiency law applicable to foreclosure of CMC's first deed

of trust against the 36th Street Property, see Cal. Code Civ. Proc. § 580d, he did not recall the name of the trust that held the loan. He presumably did not contact the trust to determine whether it also had attempted to contact the Debtors to collect any unpaid balance of the Adjustable Note or the allowed secured claim. McPherson credibly testified that he does not know who may have attempted to call the Debtors.

McPherson also testified that CMC's loan records do not reflect that CMC ever explained to the Debtors why or how it recalculated the monthly payments, and he further testified that, according to the call log or comment history, CMC never spoke to the Debtors by telephone. Of the calls for which he was aware, however, McPherson testified that he never reviewed any of the auto-dialed phone calls and could testify only about his general belief as to the outbound language of typical CMC auto-dialed calls. In other words, McPherson has no personal knowledge of what actually occurred in connection with any phone calls made to the Debtors before or after August 8, 2013, but he must rely on the call logs and comment history generated by CMC. His testimony is the only evidence offered by CMC to contradict the testimony of Martinez and Flores as to the calls they received from CMC after the Discharge Order was entered.

Having considered the testimony of Martinez and Flores, as well as the testimony of McPherson, the court finds that calls were received by the Debtors from, or on behalf of, CMC seeking to collect at least portions of CMC's claim that was discharged in this case. The court also finds that the NOD and the Notice of Sale represented the culmination of CMC's efforts to collect at least the balance of the allowed secured claim as a personal liability of the Debtors. The court generally

finds McPherson to be a credible and at times reluctant witness but limited by his lack of personal knowledge and saddled with records generated and maintained by CMC that appear to be incomplete, inaccurate, or both. Thus, notwithstanding the contrary testimony offered by CMC's only witness, the court finds the Debtors' testimony to more credibly explain the actions taken by, or on behalf of, CMC in this case.

Having concluded that CMC intended the actions that violated the Discharge Injunction, the second prong of the Ninth Circuit standard has been met. Therefore, the court also concludes that CMC's violation of the Discharge Injunction was willful.

### B. Actual Damages.

Debtors' pecuniary losses from CMC's violation of the Discharge Injunction were minimal. Martinez did not miss work or suffer any wage loss, and Flores did not either. Martinez did not seek medical treatment, but Flores testified that since May 2014, he spends $25.00 each month for his antidepressants. Flores testified that he spends over $200.00 each month for health insurance, but did not specify when those health insurance payments commenced.

Debtors' non-pecuniary losses consist of any emotional distress caused by the violation of the Discharge Injunction. Individual Chapter 11 cases and Chapter 13 adjustment proceedings are different from non-individual Chapter 11 cases and individual Chapter 7 proceedings because the debtor must obtain confirmation of a plan, and is not eligible for a discharge until plan payments are completed. Additionally, once plan payments are completed, the individual Chapter 11 debtor's discharge is not entered until approved by the bankruptcy court. Only after the discharge is entered does the individual debtor receive relief

from the anxiety and pressures inherent from the bankruptcy process, and only then can the "honest but unfortunate" debtor begin his or her fresh start. Thus, for the Debtors, violation of the Discharge Injunction had distinct emotional costs that were not "inherent in the bankruptcy process" at all. Instead, they had completed the bankruptcy process and were entitled to the full protection of the Discharge Injunction.[46]

But that protection was lost when CMC sent the demand letters and notices to the Debtors that led to the NOD and Notice of Sale threatening the assertion of personal liability. It was lost when phone calls hectoring the Debtors to pay amounts not required by the confirmed plan, and threatening to seek the balances of the allowed secured claim or the Adjustable Note, were made by, or on behalf of, CMC. That both Martinez and Flores would suffer significant emotional distress is not unexpected.

In this circuit, a bankruptcy court may award, in addition to actual damages, mildly punitive fines for a violation of the Discharge Injunction. See discussion at 158, supra. Beyond that, the contempt sanction becomes criminal in nature, and a bankruptcy court has no authority to impose such a measure. In their written and oral argument, Debtors suggest that the court should consider the $1,000 per violation figure authorized under the FDCPA, 15 U.S.C. § 1692k(a)(1)(B). See Debtors' Closing Brief at 20:6 & n.3. For several

reasons, reference to the FDCPA is problematic at best, particularly in this case.

First, the court already ordered at the evidentiary hearing that claims under the FDCPA and the Nevada consumer protection statutes, belatedly raised by the Debtors, would not be considered in connection with the instant motion. Debtors' suggestion in their post-trial brief that the court should be guided by the FDCPA damage provisions appears to be an end-run on the court's previous ruling. Second, applying a $1,000 per violation figure <u>retrospectively</u> serves none of the purposes that are at the core of a civil contempt sanction. Unlike a criminal contempt sanction that is designed to punish, a civil contempt sanction is designed to compensate the victim of the contemnor's misconduct and, if necessary, to coerce future compliance. See <u>Dyer</u>, 322 F.3d at 1192. Adopting a $1,000 per violation figure can be arbitrary as it does not take into account the circumstances of the individual victim, and therefore, would not compensate for the actual damages suffered.[47] By contrast, a <u>prospective</u> application of a $1,000 per violation figure, or some other meaningful amount, would have the coercive effect of encouraging compliance with the court's order while also providing the notice required to comport with due process. Imposing a $1,000 per violation sanction on CMC for its past conduct may be convenient, but it serves none of the purposes of a civil contempt remedy.

---

**46.** In this respect, an individual who suffers a violation of the Discharge Injunction is very different from an individual injured by a violation of the automatic stay or a violation of a plan confirmation order. In the latter two situations, the bankruptcy process typically has not been completed and the anxieties and pressures continue. For the individual whose goal is to obtain a discharge, the anxieties and pressures should be relieved after the discharge is entered.

**47.** A $1,000 per violation figure can be too high in some cases, but too low in others. Repeated attempts by a creditor to collect a discharged debt may cause little concern to an individual who is represented by effective bankruptcy counsel, but may be gut wrenching to a pro se debtor who thought he had received a fresh start.

Finally, applying the statutory damage amount permitted by the FDCPA[48] under the guise of enforcing the Discharge Injunction would be a judicial end-run on the Ninth Circuit's established view that civil contempt, rather than a claim under the FDCPA, is the sole remedy for violation of Section 524. See Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 511 (9th Cir. 2002)("Because [debtor's] remedy for violation of § 524 no matter how cast lies in the Bankruptcy Code, her simultaneous FDCPA claim is precluded."). The circuit's decision in Walls does not prohibit a bankruptcy court from considering the damages that are permitted under various non-bankruptcy statutes, but the court's use of a particular figure or determination of a particular amount should be based on the evidence presented and the record in the case rather than simply judicial instinct. Compare Nilsen v. York County, 400 F.Supp.2d 266, 277 (D. Me. 2005)(district court rejected multi-factor approaches to fee awards as not being a "rule of law or even a principle," but merely an award of fees based on the judge's instinct, "a fee 'Gestalt,' as it were."). The court therefore rejects the Debtors' suggestion that a standardized amount per violation is an appropriate measure of their actual damages.

▮▮▮ Based on the evidence presented, the court finds that Martinez did not suffer any monetary losses caused by CMC's violation of the Discharge Injunction. The court finds that Flores incurred monetary losses in the amount of $25.00 per month for his antidepressant medication beginning in May 2014. The total amount through the date of the evidentiary hearing on the Sanctions Motion is $650.00. The court does not include the $200.00 or more that Flores spends each month on health insurance because there was no evidence establishing that he started purchasing health insurance only after the Discharge Injunction was violated. In other words, the health insurance premiums may have been an ongoing expense that were not caused by the discharge violation.

Based on the evidence presented, the court finds that Martinez suffered significant emotional distress caused by CMC's violation of the Discharge Injunction. The court has found that letters and notices were sent by CMC, and that calls were made by, or on behalf of, CMC, in violation of the Discharge Injunction. Applying a

---

**48.** 15 U.S.C. § 1692k is the damage provision for violations of the FDCPA. Debt collectors who violate the statute are liable for "any actual damages" sustained by any individual person as well as "any additional damages as the court may allow" not exceeding $1,000. 15 U.S.C. §§ 1692k(1) and 1692k(2)(A). 12 U.S.C. § 2605(f) is the damage provision for violation of the Real Estate Settlement Procedures Act ("RESPA"). Parties who violate the statute are liable for each violation in an amount equal to "any actual damages" sustained as well as "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. §§ 2605(f)(1)(A and B). Unlike RESPA, the damage provision of the FDCPA does not refer to liability for "each such failure" to comply with the stat-

ute. Both statutes, however, distinguish between "actual damages" and "additional damages," with the latter being capped. Under this statutory scheme, it may be inappropriate to refer to the statutory caps for guidance because those figures appear to have been intended by Congress for a type of damages that serve a non-compensatory purpose. The distinction should be carefully considered by a court in awarding actual damages under RESPA. See, e.g., Lucero v. Cenlar FSB, 2016 WL 337221, at *4 (W.D.Wash. Jan. 28, 2016)(applying $500.00 and $100.00 daily emotional distress damages based on loan servicer's failure to respond to a RESPA demand). The same care should be taken when awarding actual damages for a violation of the FDCPA as well as in awarding actual damages for a violation of the discharge injunction.

fixed dollar amount to each letter, each notice or each call,[49] however, would be arbitrary because it assumes that each individual responds in the same way each time. The evidence presented does not support a per violation approach in this case inasmuch as, while both Debtors suffered emotional distress, only Flores sought medical attention and only Flores was prescribed, and continues to take, antidepressant medication. Absent a particular formula, the court concludes that the amount of $25,000 appropriately compensates Martinez for the emotional distress caused by CMC's willful violation of the Discharge Injunction. This amount is based on the cumulative effect of the actions attributable to CMC, including the impact on Martinez's sleep and job performance, the creation of discord in his personal relationship with Flores, the destruction of the peace of mind intended by the discharge, and the credibility of Martinez's testimony presented at the evidentiary hearing.

The court also concludes that the amount of $35,000 appropriately compensates Flores for the emotional distress caused by CMC's willful violation of the Discharge Injunction. This amount is based on the cumulative effect of CMC's actions, which also takes into account: (1) Flores's testimony that he answered only one out of the three calls from CMC after the discharge was entered, (2) Flores's testimony that he was not familiar with the language of the NOD until presented a copy at trial, and (3) Flores's testimony that his occupation as a therapist is an independent source of stress. Those considerations serve to limit the amount of the emotional distress award. However, the amount awarded also is based on Flores's uncontroverted testimony that he sought professional assistance for the additional stress, that he was prescribed antidepressant medication after CMC had commenced steps leading to the foreclosure of the 36th Street Property, and that he still takes such medication. Additionally, the amount awarded takes into account the impact of CMC's action on Flores's domestic relationship with Martinez, the destruction of the peace of mind intended by the discharge, and the credibility of Flores's testimony presented at the evidentiary hearing.

Based on the foregoing, the court concludes that Martinez suffered actual damages in the total amount of $25,000 as a result of the violation of the Discharge Injunction. The court also concludes that Flores suffered actual damages in the total amount of $35,650 as a result of the violation of the Discharge Injunction.

### C. <u>Punitive Damages.</u>

As previously discussed, this court has no authority to award punitive damages for a violation of the Discharge Injunction, but it does have authority to award mildly, non-compensatory fines in appropriate circumstances. In other circumstances, this court has awarded non-compensatory fines not exceeding two percent of the total amount sought by a lender that violated the Discharge Injunction by commencing a post-discharge lawsuit for the full balance of the discharged obligation. See, e.g., In re Grihalva, 2013 WL 5311227, at *6 (Bankr. D. Nev. Sept. 3, 2013)(imposing $10,000 fine when lender filed post-discharge state court complaint seeking per-

---

49. Debtors have not requested an award of actual damages on a <u>daily</u> basis, e.g., a fixed amount for each day between the August 8, 2013, letter when CMC considered the Debtors to be in default, and August 14, 2014, when the foreclosure sale was rescinded. Compare <u>Lucero v. Cenlar FSB</u>, cited at note 48, <u>supra</u>, awarding daily fines for a continuing violation of RESPA.

sonal judgment in the amount of $584,857.06). In the instant case, the Notice of Sale states, without limitation, that $104,346.49 was owed by the Debtors and that debt collection was being attempted.

█ A fine is appropriate in this case because of CMC's refusal to provide prior notice of its change in the Debtors' monthly payment or notice of its retroactive application of the change. Even after it made the unilateral decision to do so on August 17, 2012, and eventually treated the Debtors to be in default as of August 1, 2013, CMC never explained its basis for doing so or revealed its past decisions in the August 8, 2013, letter. CMC's argument that it can unilaterally change a debtor's monthly payments after plan confirmation, and also retroactively apply that amount without prior notice, is the policy equivalent of "shoot first and ask questions later." In this case, however, CMC also argues that it was the victim's duty to ask questions later rather than the shooter's. That untenable position is reflected in the August 8, 2013, letter, as well as the testimony of CMC's officer establishing that CMC never informed the Debtors of its actions. The court has no evidence indicating whether CMC has a policy of unilaterally adjusting confirmed plan payments without notice in other bankruptcy cases, or retroactively applying payment amounts without notice in other bankruptcy cases, or whether it has limited that privilege to these Debtors. In either event, CMC's conduct supports, at the very least, a mildly, non-compensatory fine of $5,000.00 that must be paid to the Debtors.

### D. Attorneys' Fees.

The court previously awarded attorneys' fees and costs to Debtors' counsel in the amount of $3,500, and also ordered reimbursement of the $1,717.00 filing fee to reopen the bankruptcy case. The Fee Motion filed on February 4, 2015, alleged that such attorneys' fees and costs had been incurred to the date that motion was filed. The Fee Motion was not opposed by CMC, and the requested amount was awarded.

Under these circumstances, the court will allow the Debtors to recover attorneys' fees and costs incurred in connection with the Sanctions Motion after February 4, 2015, through the date of the closing arguments presented on July 18, 2016. Debtors' counsel will be required to submit an itemized billing statement by an appropriate date, and CMC will be allowed an appropriate amount of time to submit objections to the billing statement. Thereafter, the court will enter a supplemental order with regard to attorneys' fees and costs.

The attorneys' fees and costs shall be awarded under Section 105(a) in connection with CMC's violation of the Confirmation Order and the Discharge Injunction. No attorneys' fees and costs shall be awarded under Section 362(k).

### CONCLUSION

For the reasons discussed in this Memorandum Decision, the Sanctions Motion will be granted in part and denied in part. A separate order has been entered contemporaneously herewith.

